CASE 85—PETITION EQUITY—JULY 1.

## Anderson's adm'r vs. Whitlock, &c.

APPEAL FROM CHRISTIAN CIRCUIT COURT.

Anderson, Whitlock & Co. being the owners of mills in Christian county in 1862, in the regular course of their business, whilst that section of the State was under Confederate rule and occupied by the Confederate army, came into possession of about eight thousand dollars in Confederate currency, which, after the Confederate army ceased to occupy that part of the State, became of little or no value, and thereupon the partners agreed that Anderson should take this money south and invest for the benefit of the firm. Anderson took the money south, and engaged in buying and shipping cotton to St. Louis and New York, and made large profits by his transactions, and refused to account to his partners for any part of the profits. *Held*— That, as Anderson invested the partnership effects, his partners are entitled to share the profits, as, upon the other hand, if his investments had been unfortunate or disastrous, they would have been bound to have shared the losses.

H. A. PHELPS,                                    For Appellant,

CITED—

1 *Duvall*, 20; *Laughlin vs. Dean.*

*MSS. Opin., Winter Term*, 1863; *Campbell vs. Anderson.*

JOHN W. McPHERSON,                    For Appellees,

CITED—

*Story on Agency*, *pp.* 194, 195.

3 *Chitty on Com. and M.*, *chap.* 3, *pp.* 216–21.

*Smith's Mercantile Law*, 49.

*Paley on Agency*, 3–4.

*Story on Agency*, *secs.* 31, 32, 205, 229–30.

40 *Law Library*, *p.* 53 ; *Keech vs. Sanford.*

2 *Johnson's Ch. R.*, 108 ; *Hart vs. Ten Eyck.*

29 *vol. Law Library.*

*Lindley on Partnerships*, *vol.* —, *pp.* 176–7.

3 *Met.*, 50 ; *Fahnestock vs. Baily & Varnon.*

*Hill on Trustees*, 221 *to* 224.

*Act of Congress of July* 13, 1861.

*Act of Congress of May* 20, 1862, 12*th vol. Stat. at Large*, 404.

CHIEF JUSTICE PETERS DELIVERED THE OPINION OF THE COURT:

Appellant's intestate and appellees having purchased the Eclipse Mills, in Christian county, in March, 1860, entered into articles of copartnership for running and operating said mills for the term of three years, under the style and firm name of Anderson, Whitlock & Co.

The partners advanced an equal portion of the capital invested in the enterprise, and were to share equally the profits and losses, and stipulated, that, during the continuance of the partnership, amongst other things, they would exert themselves for their joint interest, profit, and advantage; that just and true books should be kept, wherein each partner was to enter as well all money by him received, paid, laid out, and expended about their business, as also everything sold or bought on account of the business of said firm, and the books to be so kept that the partners should, at all times, have access thereto without interruption or hindrance; and that each part-

ner, at the close of each and every year, or oftener if necessary, should render to the others a true and just account of all profits by him and them made, and of all losses sustained, and of all other things by them and each of them acted and done in the business of their partnership. For a period of eighteen months, perhaps, after they had embarked in the enterprise, it was harmoniously and skillfully conducted, and great gains were realized by the partners; but then that portion of the State was invaded by Confederate forces, and was held by them until the fall of 1862, during which time they appropriated the products of the Eclipse Mills, and paid for them in Tennessee bank notes or Confederate money, or both. After the country was abandoned by said Confederate army, this money was not current and of little value; it was, however, disposed of by appellant's intestate, and this litigation has arisen from his failure to account satisfactorily to his partners for the proceeds.

It is alleged in the petition, that when the Confederate army abandoned Christian county, the firm had on hand about eight thousand dollars of Confederate and Tennessee money, which was not current and was then of little value, and it became a question with the partners what was best to be done with it to make it available; that the intestate was the financial agent of the firm, and he, in their consultations, proposed to go south to invest the money, to which the other partners assented; and, knowing his skill as a financier, gave him plenary power to invest it according to his own judgment. That, in accordance with said agreement, said Anderson did go to Memphis and other places in the south, and invested said eight thousand dollars or more in cotton, at a price not exceeding eight cents per pound, in the funds of the firm, which was very low; and he shipped the

cotton thus purchased to St. Louis and other points, where he sold it for very high prices, ranging from sixty to seventy cents per pound, all of which he collected and illegally and fraudulently held, and converted the whole of the proceeds to his own use, and failed and refused to account to his partners for any part thereof. It is also alleged that Anderson discounted said eight thousand dollars at a very heavy rate, then charged himself on the books of the firm with the amount, after taking off the discount, without the consent of his partners, took the whole speculation to himself, and charged his expenses of the trip to the firm. Anderson having died after his return from the south intestate, this action was brought by appellees against appellant as his administrator for a settlement of the partnership, and especially for a settlement of the cotton speculation in the south, in which, as is alleged, he made a profit of sixty thousand dollars; and for their respective shares of said sum they pray judgment and for general relief. The articles of copartnership are made part of the petition.

In an amended petition it is alleged that Anderson acted as the .agent of said firm in selling flour, meal, and the products of their said mills, and when appellees learned he was selling for Confederate and Tennessee money, they protested against such sales; but he persisted in making sales for said money, saying it would be as good as gold, and he would see that the firm would sustain no loss on that account, and upon these terms they consented for him to continue to sell. That Anderson agreed to go south, and did go, for the express purpose of investing said funds in land or cotton, which could and might be converted into current funds for the benefit of said firm; and while in the south, with said funds purchased, as they charge he admitted to them, one

hundred thousand pounds of cotton, all of which he caused to be sold at the sum of $70,000, and for two thirds of that sum they pray judgment. They make the books kept by Anderson parts of their petition, to the entries on which, as made by Anderson, they objected, and refused to sanction, especially those on page 123. That, after he returned from the south, he concealed from them for a considerable length of time the fact that he had purchased cotton, but charged himself on said books with three thousand seven hundred and ninety-one dollars and forty-six cents. This conduct they allege they refused to sanction and to continue longer the partnership with him, and he then sold his interest to another partner. They charge that the books of the firm, as kept by said Anderson, are false and fraudulent, made so by him to defraud them; and that he is indebted to them as his partners in the sum of eight hundred dollars over and above the cotton speculation. They pray for a full settlement of the partnership accounts, and for the proper judgment.

It is admitted in the answer that the persons named formed a partnership for the purposes and on the terms stated in the petition, and that Anderson was the financial partner of the firm, who, as is alleged in the answer, kept a book showing the amount of funds received and disbursed by him for said firm. It is, however, denied that he had on hand at the time designated in the petition eight thousand dollars; but the amount is stated to be six thousand eight hundred and ninety-six dollars in Confederate money, which Anderson took south for the purpose of converting into Tennessee paper or other currency, and not to invest in cotton or any other article, and that he exchanged the same for Tennessee money or other currency at a discount of thirty *per cent.*, and that

he kept a book in which he charged himself with all the money he received for said firm and credited himself by the sums paid out, which book was subject to the inspection of the other members of the firm, and was delivered to the partner, John C. Whitlock. That seventy cents on the dollar was all he realized for said Confederate money, which was the best at the time that could have been done with it; but that he did *not* invest the partnership funds in cotton, as he, appellant, is informed. He alleges that it will appear from an inspection of the books that there is an error on them to the prejudice of Anderson, and when corrected, there will be a balance in his favor of $————; and the indebtedness by Anderson to the firm in any sum whatever is denied.

It appears that Anderson sold his interest in the mill property, with the consent of the other partners, to one John Whitlock; but that sale did not affect the rights of the parties growing out of the alleged cotton speculations, or to a settlement with Anderson of the firm accounts and business transactions prior to the sale.

The material allegations of the amended petition are controverted by the answer thereto, and in said answer it is stated that Anderson, upon his return from the south, informed his partners that he was unable to exchange the Confederate money for current funds, and in consequence thereof he had invested them in cotton, a part of which had been burned, and told them they could have an interest in the cotton, or he would take the Confederate money at thirty per cent. discount, and they refused to have anything to do with the cotton.

The accounts were referred to the master, who reports that the proof taken is meager and unsatisfactory, but that he had made up the accounts "on several hypotheses, each of which he submits to the court." Excep-

tions were taken to the report by appellees; and on final hearing, without formally disposing of the exceptions, the court below rendered judgment in favor of the plaintiffs in that court for one thousand one hundred and forty-one dollars and ninety-one cents, with interest from the date of the judgment until paid, and costs, to be levied of assets, &c. From that judgment Anderson's personal representative has appealed, and the surviving partners prosecute a cross-appeal.

It is contended by appellant's counsel, that even if Anderson had contracted with his partners to go south to exchange the Confederate money or invest it in cotton, that such contract would be illegal, and no action could be maintained upon it. This question we regard as settled by this court in manuscript opinion of the 31st of May, 1867, in the case of *Martin vs. Horton*, where the authorities on the question are reviewed at length, and the court held, that "the circulation of Confederate currency within the military lines and jurisdiction of the United States was forbidden by its laws and public policy, hence illegal. The circulation of United States treasury notes within the military lines and jurisdiction of the Confederate States was likewise prohibited by their laws and public policy. The laws and policy of each were to foster and encourage the circulation of their own currency, and to discourage and prohibit the circulation of the currency of their adversary; therefore, the non-combatant citizen must regulate his conduct by the power which might predominate over him for the time being."

As then the county of Christion was, when the Confederate money was received by the firm for their articles, within the military lines of the Confederate government and within their jurisdiction, and the reception of

it for their articles a necessity, perhaps, the investment of it in the south in cotton or other products by one of the partners would constitute a sufficient consideration to make him responsible for the proceeds, especially as he voluntarily undertook the mission, and, as is not improbable, was not opposed to furnishing the products of their mills to the Confederate army for the money received. Under such circumstances, to deny a remedy to the injured partners would not only be permitting the party to profit by his own wrong, but would be aiding him in the perpetration of a fraud. This ground cannot, therefore, be available for a reversal. The case of *Laughlin vs. Dean* (1 *Duvall*, 20) is not analogous to this case. Wherefore, as no errors are perceived in the judgment prejudicial to appellant, the same cannot be reversed on the original appeal; but upon the cross-appeal we are constrained to a different conclusion.

By the terms of the partnership agreement, independent of the general law on the subject, each one of the partners expressly and directly stipulated to exert himself during the continuance of the partnership for their mutual interest, profit, and advantage, and to keep just and true books, wherein all the actings and doings of each partner should be entered, and the same to be at all times open to the inspection of all the members of the firm.

There is no evidence adduced that Whitlock & Johnson had contracted with Anderson to sell the Confederate money on hand to him. The term for which they had formed the partnership had not terminated, and we must assume that Anderson went South for the benefit of himself and partners. If, therefore, he made investments of partnership effects which resulted profitably, his partners

were entitled to share the profits; as, upon the other hand, if his investments had been unfortunate or disastrous, they would have been bound to have shared the losses.

From the evidence in this case, it seems that large profits were realized by the adventure, and that the shares of each of the partners in said profits were greater than the amount for which the judgment was rendered in their favor, and that the basis for a final settlement is simple, and is furnished by the proof already taken.

The quantity of cotton sold on account of the intestate, at St. Louis and New York, with the price for which it was sold, is shown by the evidence now in the case; and the price at which it was purchased is also shown— say eight cents per pound—to which are to be added the cost of getting the cotton to market, which seems to be about fifty dollars per bale; and the commissions for selling will form an additional charge.

The accounts should be made up by charging appellant's intestate with the amounts of sales in St. Louis and New York, and crediting him by the costs, including his expenses, the original cost of the cotton, of taking it to market, and commissions for selling. And if appellant can show by the proof that any of the cotton sold on his account in said markets was purchased with the means of other parties, and not with the firm effects, he should be credited by the amount thus purchased.

This can work no hardship on appellant's intestate, because he expressly covenanted to keep a fair book of entries, showing all his actings and doings relating to the partnership; and if a loss should result from a failure on his part to discharge this duty, it will fall on the delinquent party, where it should fall. Appellant should be credited by any other sums that he may hereafter show himself entitled to.

Wherefore, the judgment is reversed on the cross-appeal, and the cause is remanded, with directions that it be again referred to the master for the ascertainment of facts as herein suggested, and for further proceedings consistent with this opinion.