## Chambers v. Johnston, Jr.

(Decided March 22, 1918.)

Appeal from Jefferson Circuit Court
(Chancery Branch, First Division).

1　Partnership—Accounting for Profits.—If a partner uses partnership funds in an enterprise of his own, or secures a contract for himself, which it was his duty to secure for the partnership, or purchases property, which he should have purchased for the partnership, or without the consent of his co-partners, engages in a business similar to the partnership business, so as to be in competition with it, he may be required to account for the profits.

2.　Partnership—Accounting for Profits.—Although the partnership contract requires a partner to give all of his time and exertions to the partnership business, if he engages with his own means in an enterprise, which is not within the scope of the partnership, he can not be made to account to his partners for the profits, but they may have relief against him by some other proper remedy.

3.　Partnership—Settlement.—A settlement between partners, of the partnership business, is binding and conclusive upon the partners, except where it may be avoided upon the ground of fraud or mistake.

4.　Partnership—Settlement—Fraud or Mistake.—Where one of the partners knows all about the partnership business, and the other has little or no knowledge of it, less evidence is required to open the settlement for relief for fraud or mistake, in behalf of the one with little knowledge of the business, than would be necessary if both parties were acquainted with all the facts, and repose no special confidence in each other.

5.　Partnership—Settlement—Relief.—Where the facts of a partnership transaction lie exclusively or nearly so within the knowledge of one partner, and he secures an advantage in the settlement by a concealment, the other may have relief against it, although no misrepresentations were made.

6.　Partnership—Settlement—Mistake—Relief.—A partner induced to accept a settlement by a misrepresentation of the other, although innocently made, may have relief because of the mistake, where he sustains a substantial injustice by reason of the mistake induced by the mistaken misrepresentation.

ALEXANDER P. HUMPHREY and WILLIAM MARSHALL BULLITT for appellant.

BENJAMIN F. WASHER and BURNETT, BATSON & CARY for appellee.

Opinion of the Court by Judge Hurt—Affirming.

On April 1st, 1911, the appellant, Henning Chambers; the appellee, J. Stoddard Johnston, Jr., Samuel

C. Henning, and Lynford M. Dickinson, became part-
ners, under the name of Henning, Chambers & Co.  The
contract of partnership was reduced to writing and re-
cites as the objects and purposes of the partnership, as
follows:

"That for and in consideration of their respective
agreements herein contained, it is agreed between the
parties as follows, to-wit:

(1.)   The said parties agree to become and hereby
do become partners: (1) for the purpose of carrying on
the business of stock and bond brokers, and dealings in-
cidentally connected therewith; and, (2) for the purpose
of dealing in the cities of New York, Chicago, Louisville
and elsewhere, through the various exchanges and other-
wise, in stocks, bonds and other securities, cotton, grain,
coffee, produce, provisions and other commodities."

It will be observed, that by the terms of the partner-
ship contract, the activities of the partnership and its
scope and purpose were not confined to "carrying on
the business of stock and bond brokers, and dealings in-
cidentally connected" with the business of stock and
bond brokers, but, by the second subsection of section 1,
the further business of "dealing" in all other places
"through the various exchanges and otherwise," not
only in stocks and bonds, but in "other securities."

Section 2, of the contract, is as follows:

"The business of the partnership shall be conducted
under the firm name and style of Henning, Chambers &
Co., and shall have offices in the city of Louisville, state
of Kentucky, and in the city of New York, state of New
York, and in such other places as from time to time may
be deemed advisable."

Section 4, of the contract, provided as follows:

"Each of the partners, except Samuel C. Henning,
shall at all times during the continuance of the partner-
ship give all of his time, service, influence and exper-
ience, and do the utmost of his skill for the joint inter-
est, profit and advantage of the business aforesaid."

The reason for excepting Henning from the require-
ments of this provision of the contract is explained, in
the evidence, to be the fact, that he was then in very
feeble health.

By other terms of the contract it was provided, that
the partners should, "as capital for the use of the part-
nership and to be used for its business," put into the
partnership funds the following amounts, respectively:

Samuel C. Henning, $32,500.00; Henning Chambers $32,500.00; Lynford M. Dickinson $25,000.00; and J. Stoddard Johnston, Jr., $5,000.00. Henning, also, contributed to the use of the partnership a seat upon the New York stock exchange, estimated as of the value of $75,000.00, and one upon the Chicago stock exchange, the value of which was not stated. Each of the partners was to be paid interest annually upon the sum contributed by him, as above provided, to the capital of the partnership. The net profits of the partnership, so far as it concerned, Henning, Chambers and Johnston, were to be received by them in the following proportions: Henning, 40%; Chambers, 40%; and Johnston, 15%. At the beginning, the contract contained other provisions, which regulated the receipt of the net profits of the New York office and the amount to be received by Dickinson, but Dickinson, in the summer of 1911, withdrew from the partnership and the sum contributed by him to the capital of the firm was withdrawn by him, and thereafter it was mutually agreed by the remaining partners, that Johnston should receive 20% of the net profits of the business, instead of 15%, as theretofore. There is no controversy upon the latter subject. The partnership continued between Henning, Chambers and Johnston until the first day of February, 1914, when it was dissolved and a settlement had of its business and affairs as of December 31st, 1913. The dissolution was caused at that time by the death of Henning, on December 23rd, 1913. After the dissolution of Henning, Chambers & Co., a partnership to continue the same character of business was formed by Chambers, Johnston and McCraw. The representatives of Henning were settled with and the new partnership took over the assets and liabilities of the old partnership. The new firm continued in existence until April, 1914, when it was dissolved by the retirement of Johnston. A settlement of the business of the partnership was had and all matters between the members and the partnership were adjusted and settled, except one or more, minor, inconsequential items, which were necessarily continued at that time for final adjustment, in the future.

The matter out of which the litigation, in the present action, arose, transpired during the year, 1912, during the existence of the partnership of Henning, Chambers & Co. and after the retirement of Dickinson. As the chief issue in the action is as to whether or not the transac-

tion was one, which came within the scope of the partnership, and was a matter, which, by the articles of the partnership contract, was a partnership business, it becomes necessary to set out the facts of it with some degree of particularity. In the endeavor to develop the facts of the transaction, and to show its connection, or want of connection, with the partnership, the parties asked questions of witnesses to the number of between thirteen and fourteen thousand and received answers thereto, and in addition thereto filed many pages of exhibits, and have further urged the views of counsel in 580 pages of printed and very helpful briefs. As gathered from the evidence, the salient facts pertaining to the matter in controversy, are, that there existed in Indianapolis, Indiana, a public utility corporation, known as the Merchants Heat & Light Company, and of which Edward L. McKee was president. Its capital stock consisted of five thousand shares of preferred, six per cent. stock, and the same amount of common stock, all of the par value of one hundred dollars, per share. It had been in operation for about ten years, during which time its common stock had increased in value from par to two hundred dollars per share. It had in its treasury one hundred thousand dollars, in money. It owed first and second mortgage bonds, outstanding, but not yet due, in the sum of $1,425,000.00, and other debts to the sum of three to four hundred thousand dollars, and on account of the increasing demands upon it, as a public utility, needed some additional funds for improvements and additions to its physical property. It had competition in the field of operation, in the person of another company, engaged in the same business, with it, that of furnishing heat and light to the community in which it was located. Field, Longstreth & Co., brokers and bond dealers in Cincinnati, Ohio, had conducted for it the sale of $1,000,000.00, par value, of its bonds, and were probably underwriters of that issue of bonds. Field knew to whom the bonds were sold and, from his association, with the company, he seems to have concluded, that the Merchants Heat & Light Co. had need of further "dealing" as to its stock, and he began negotiations with its president and the competing company to buy the common stock of both companies and to consolidate them, and preparatory to doing so to buy options to purchase the common stock of the Merchants Heat & Light Co. at one hundred and forty dollars per share, but on account of

the opinion of the attorneys of the persons, who were contemplating furnishing the money or a portion of it, to effect the deal, that the proceedings, under the laws of Indiana, could not be carried out, the attempt was abandoned. Field then began negotiations to buy the common stock of the corporation and to further deal with it, having in contemplation the organization of a holding company, a transfer of the stock to it, and to sell the stock of the latter company. He called to his assistance Walbridge & Co. and J. G. White & Co., of New York. The latter had been advising engineers of the company and was acquainted with its property and possibilities. The common stock had, however, in the meantime been advanced by its owners from one hundred and forty dollars per share to one hundred and sixty, and then to two hundred dollars per share.

In the meantime, Mr. L. H. McHenry, of Louisville, Kentucky, who seems to have had considerable experience in judging of the possibilities of utility corporations, also, became impressed with the view that the stock and assets of the Merchants Heat & Light Co., ought to be dealt with; and had examined its properties and prepared a report pertaining to them, and had, also, called the attention of Walbridge & Co. and other dealers in the stock of utility corporations to that which was presented. Field and McKee visited New York for the purpose of negotiating, in regard to the proposition to buy the stock of the company, and, while there, were in consultation with Walbridge & Co. and J. G. White & Co., but no definite agreement was made between them, although it seems that a tentative arrangement was made. Walbridge & Co. sent for McHenry, who, before going, visited Indianapolis and then went on to New York, where Walbridge said to him, that in view of the fact, that he had done a good deal of work with regard to the Merchants Heat & Light Co. and in efforts to sell it, and that he was contemplating buying it, he thought that McHenry was entitled to some kind of compensation in the deal. McHenry and Walbridge, however, failed to agree and McHenry called the attention of Mr. John W. Barr, Jr., to the matter while in New York. McHenry returned from New York and after further negotiations with McKee, again saw Mr. Barr, who in the meantime had interested Henning Chambers in the proposed deal. It seems, that McKee was willing to undertake to secure options from the holders of its

common stock for its sale to any one, who would pay two hundred dollars a share for it, but before the options should be secured, the intending purchaser would be required to purchase an option and pay therefor the sum of five dollars per share. McKee represented to McHenry, Barr and Chambers, that no arrangement existed between him and Walbridge & Co. or any of the New York parties, for the sale of the common stock, but before any agreement was made with McKee, a telegram was sent to Walbridge & Co., advising them of the intention of McHenry to form a syndicate to buy the stock and inviting Walbridge & Co. to participate with him, but no answer was received to the telegram. McKee, after notifying Walbridge & Co. that he would wait until the 18th of June, then telegraphed, that negotiations were discontinued. On June 17th, Chambers, Barr and McHenry put into the hands of the latter $25,000.00 to purchase the options upon the common stock. Each of them furnished one-third of the amount or $8,333.34. On June 18th, McHenry, representing Chambers, Barr and himself, signed a contract with McKee, by which the latter agreed to secure contracts, from the holders of the common stock, to sell their stock at two hundred dollars per share, at any time, before October first, in consideration of five dollars per share, the sum paid for the option to remain the property of the stockholder, if the purchase was not made and the money paid by October first. On the same day, McKee and McHenry executed another writing, by which it was agreed, that McKee should have the same interest in the option contract as either McHenry, Barr or Chambers had. On the same day, Chambers, McHenry and Barr executed another writing, which evidenced an agreement, that the option contract between McKee and McHenry was for the equal interest of McHenry, Barr and Chambers, subject to the one-fourth interest to be held therein by McKee. Within a few days, McKee had secured options for the purchase of 4,973 shares of the common stock and notified McHenry, and, also, paid to the stockholders the five dollars per share for the option. One, of the stockholders, holding thirty-seven shares of the common stock, was under the influence of Field, Longstreth & Co., who were not pleased at losing the deal themselves, and refused to sell an option on his shares. Steps were then taken and a tentative agreement arrived at with the Harris Trust & Savings Bank, at Chicago, to pur-

chase a new issue of bonds of the Merchants Heat & Light Co. to pay off its preferred stockholders, and to satisfy its bonded indebtedness and its other obligations, as it would be. necessary to remove these obligations, before the remaining purposes of the purchasers of the option could be carried out. For several reasons, it was desirous to acquire all the common stock of the company, but the holder of the thirty-seven shares, above mentioned, would not sell for any sum less than five hundred dollars, per share, which was paid to him for the stock when Field, Longstreth & Co. had entered into the deal. Attempts were made to sell the option, but not succeeding in that, it was determined to organize a holding company, and to transfer the common stock of the Merchants Heat & Light Co. to it, and, then to issue common and preferred stock of the holding company and to sell it for a sufficient sum to pay for the common stock purchased, and to have whatever remained of the preferred and common stock as the profits of the transaction. At the instance of the Harris Trust & Savings Bank, Field was invited to participate in the deal, because of his knowledge of the whereabouts of the outstanding bonds, and to probably, further, secure his influence in securing the thirty-seven shares of the common stock, which had not yet been secured, and he agreed to participate upon the terms hereinafter stated. Field secured the firm of George Eustis & Co., brokers at Cincinnati, to participate in the deal with him. McHenry, Barr, Chambers, McKee, Field, Longstreth & Co. and George Eustis & Co., on the 9th day of August agreed, that for the purpose of dealing with the stock and property of the Merchants Heat & Light Co., that a corporation to be known as the Merchants Public Utilities Co. would be incorporated with a capital stock of $2,000,000.00, par value, preferred stock, and the same amount of common stock; that $1,000,000.00, par value, of the preferred stock should be issued and all of the common stock, and that Field, Longstreth & Co. and George Eustis & Co. would subscribe for and receive five thousand shares of the preferred stock and five-eighths of a share of the common stock for each share of the preferred, at $90.00 per block, and, would pay therefor the sum of $450,000.00, 10% of it, at that time, and the remainder on the 15th day of September, thereafter; that McHenry, Chambers, Barr and McKee would subscribe for and receive a like amount of the preferred

and common stock of the Merchants Public Utilities
Co., and would pay therefor a like amount at the same
times; and these shares of the preferred and common
stock would be put upon the market and sold to the pub-
lic, forthwith, outside of the state of Kentucky, under
the supervision and management of Henning, Chambers
& Co. and George Eustis & Co., acting in the capacity of
what is termed syndicate managers; that each of the
members would at once pay to the syndicate managers
10% of the amount of his subscription, and the remain-
der on the 15th day of September, as above stated; that
McHenry & Co. would close the option, and with the
money paid in by the subscribers for the stock of the
Merchants Public Utilities Co., when "as and if issued,"
would pay for the common stock of the Merchants
Heat & Light Co., which would then be transferred to
the holding company, in exchange for the stock of it
subscribed for, which was $1,000,000.00, par value, of
preferred and $625,000.00, par value, of the common
stock; that the syndicate managers would then forth-
with sell this stock to the public and pay the funds to
the subscribers, in accordance with their respective
interests; that the other $1,375,000.00, par value, of the
common stock should be issued in a certificate to Mc-
Henry, who was to first transfer $250,000.00, par value,
of it to Field, Longstreth & Co., and the remainder of
the common stock and the preferred, unsold, should be
the property of McHenry, McKee, Chambers and Barr.
The price of the stock subscribed for, amounting to
$900,000.00 was not sufficient to close the option and ob-
tain all the common stock of the Merchants Heat &
Light Co., and Chambers and McHenry, representing
themselves and Barr agreed to furnish the remainder of
the money necessary, which amounted to $111,000.00.
Hornbrook, an attorney for the parties or some of them,
sought to become a subscriber for $25,000.00, par value,
of the stocks of the holding company, and was admitted
to participate in the underwriting syndicate to that ex-
tent. The above agreement was embraced in two writ-
ings, in one of which Henning, Chambers & Co. and
George Eustis & Co. appear as the parties of the first part
and L. H. McHenry & Co., Henning Chambers, George
Eustis & Co., Field, Longstreth & Co., and Edward L. Mc-
Kee are the parties of the second part, all of whom sub-
scribed the writing, except the parties of the first part.
This writing is called the underwriting agreement. The

other writing was subscribed by L. H. McHenry & Co., Henning, Chambers & Co. and George Eustis & Co., and recited that L. H. McHenry & Co. was intending to close the option and to organize the holding company, mentioned above, and to transfer the common stock upon which the option was held to the holding company, and was willing to sell $1,000,000.00 of the preferred and $625,000.00 of the common stock of the holding company, and that Henning, Chambers & Co. and George Eustis & Co. wanted to buy it and had agreed to receive it and pay therefor $900,000.00. The record does not disclose exactly who L. H. McHenry & Co. consisted of, but as McHenry held the option for the purchase of the common stock of the Merchants Heat & Light Co. for himself, Chambers, Barr and McKee, all of whom were equally interested in it, it is to be presumed, that they were the persons embraced by the term, L. H. McHenry & Co. It seems that in this transaction that Chambers subscribed the underwriting agreement individually, while to the other writing, he subscribed the partnership name of Henning, Chambers & Co. It seems that he was first agreed upon as one of the syndicate managers, so called, but, at his suggestion, the partnership of Henning, Chambers & Co. was substituted for him, which he says, he agreed to, only, subject to the approval of Johnston, and thereafter requested the approval of Johnston, but aside from that, he had authority to subscribe the name of Henning, Chambers & Co. to the writing and to contract for the partnership and the writings were all subscribed before Johnston was ever apprised of the transaction. The subscribers, on the 9th day of August, paid into the Union Trust Co., of Indianapolis, the 10% of the amount of their subscriptions to the credit of Henning, Chambers & Co. and George Eustis & Co., the syndicate managers. The amount thus paid in amounted to $90,000.00. On the 17th day of September the remainder of the $900,000.00 subscribed was paid in to the credit of the managers, and McHenry and Chambers paid in the remaining sum necessary to secure all the common stock of the Merchants Heat & Light Co. Upon the same day, the funds thus collected were transferred to McHenry and paid out to the holders of the common stock upon which the option was held, and upon the same day the Merchants Public Utilities Co. was incorporated, with McKee, Hornbrook and three others, whom one or more of the witnesses de-

scribe as "dummies," as directors. McHenry transferred the common stock of the Merchants Heat & Light Co. to the Merchants Public Utilities Co., which thereupon issued $1,000,000.00, par value of its authorized preferred stock and $625,000.00, par value of its common stock, which had been subscribed for, to be sold by the managers, and the remaining $1,375,000.00, par value, of the common stock, was issued to L. H. McHenry, as a trustee for Chambers, McKee, Barr and himself. A note was given, payable to McHenry for the amount of the money, which had to be paid for the purchase of the common stock, over and above the $900,000.00 subscribed, and thereafter $100,000.00 par value, of the preferred stock of the holding company was issued for the benefit of McHenry, Barr, Chambers and McKee, and the value of it credited upon the note. In the meantime, the Harris Trust & Savings Bank had taken up the new issue of bonds contemplated for the Merchants Heat & Light Co., and which was sufficient to pay all of its then existing debts and retire its preferred stock. About October 12th circulars were issued and a campaign started for the sale of the stock of the Merchants Public Utilities Co. in Indiana and elsewhere, except in Kentucky, by Henning, Chambers & Co., George Eustis & Co., Field, Longsteth & Co. and L. H. McHenry & Co., but these firms had but small success in the sale of the stock and McKee undertook the sale, and within three or four months all of it was sold, except a small portion, which was divided between the participants in the deal. On November 12th all of the common stock of the holding company was sold to Kelsey, Brewer & Co., of Grand Rapids, for $35.00 per share, and the deal was substantially completed. Certificates for certain of the stocks of the Merchants Public Utilities Co. were issued to Chambers, which he thereafter caused to be transferred or else taken up and new certificates issued for the stock to Henning, Chambers & Co., which he says, however, that he did for the purpose of avoiding the vigilance of the revenue agents. The sales of the stocks of the Merchants Public Utilities Co. reimbursed Chambers for all sums expended by him in effectuating the deal, and resulted in leaving him with a net profit from the transaction amounting to $117,104.56. The appellee, Johnston, claiming that the transaction was one within the scope of the partnership, sought by this action to recover from Chambers 20% of the net profits received

by him, and the circuit court so adjudged, and this appeal is from that judgment.

The judgment is sought to be reversed upon the ground, that the transaction, out of which the profits sued for were realized, was not one, which was within the scope of the partnership, in that: (1) it was not such a transaction, as was contemplated, that the partnership should or could enter into under the partnership contract, and for the further reason (2) that in January, 1914, upon the dissolution of the partnership, a full and complete settlement and accounting of the partnership business and affairs was had, and which was accepted by Johnston and that he had shown no sufficient reason for opening the settlement.

(a) It is insisted that appellant, Chambers, went into the transaction, in controversy, as an individual, and that as an individual, he had a right so to do, because the transaction was not within the scope of the partnership business: (1) and that as a partner he had a right to engage in a deal in stocks and bonds as an individual, outside of the partnership; and, (2) that as an individual, he assumed all the risks of loss and used only his individual funds.

Of course, the right of appellant to engage in the transaction under consideration, as an individual, or to engage in any transaction relative to stocks and bonds, as an individual, or whether his assumption of all the risks of the transaction and the use of his individual funds, only, would excuse him from accounting to his partner for the profits realized, depends entirely upon whether the transaction was a partnership business, and one which should have been conducted by him for the partnership, under the partnership contract. The partnership contract, as written, seems to be broad enough to embrace any transaction in the buying or selling of stocks or bonds. The contract, after providing that the partnership was for the purpose of carrying on the business of stock and bond brokers, in another subsection setting forth the purposes of the partnership and its powers, provides, that it is, also, for the purpose of dealing in stocks, bonds and other securities in the cities of New York, Chicago, Louisville and elsewhere, through the exchanges or otherwise. This seems to include dealing in securities, which are not listed or purchased through exchanges and such as have no previous fixed price upon the market, as well as others. To

"deal" in bonds and securities and commodities, in the sense in which the word is popularly used and understood, is to buy, sell and traffic in them, and a "deal" as applied to an arrangement with regard to speculations in stocks and bonds, is a combination of interested persons to attain a certain result, the prime object being usually the purchase, sale or exchange of such property for a profit. Hence, the transaction was entirely within the lines of business provided for by the partnership contract, according to its terms. There is no contention by any one, that the contract, as written, is other than was agreed upon and intended by the parties when it was executed. There can be no question, but the transaction was a dealing in the stocks and securities of a corporation. If the partnership was authorized to purchase stocks of a corporation for its own account, it was necessarily authorized to buy an option for its purchase, as that was only one of the steps in the contract for the purchase. Aside from the fact that the transaction was plainly one of dealing in stocks, if it should be contended, that it was not within the scope of the partnership business for the reason that the partnership articles did not contemplate a purchase of stocks with the intention of holding them for a rise in the market and a sale of them for a profit, it is observed that the partnership contract does not prohibit the purchase of stocks for the firm's own account and the holding of them for the purpose of a speculative rise in their values in the market, besides it is plainly evident from all the evidence, that the purchase of the option was either for its immediate resale, which would be one way of dealing with the common stock of the Merchants Heat & Light Co., or else it was intended to sell the stocks to the public, as soon as it could be done, or else to exchange the stocks for others in a holding company, increased in volume to such an amount as to make the transaction a profitable one, and the sale of the new stock in such quantities or in such a way as to realize a profit, as soon as it might be done. There is an entire absence of anything indicating an intention to make a permanent investment for the purpose of receiving interest or dividends from the holdings. The entire transaction was undisputably a deal for the purpose of buying, selling and trafficking in stocks, and the fact, that it was possible, that a sale might not be had, at as early a moment as was intended or desired, would

not change the character of the transaction, because such a delay is a risk, which attends any kind of a purchase for a resale. The fact that the transaction was not exactly similar to any deal in stocks in which the partnership had theretofore engaged does not prevent it from being a partnership business, if it was one in which the partnership might engage within the terms of the partnership contract, as there are doubtless many other deals in stocks, which are within the partnership business, with different features, however, in which the partnership never did participate. The law governing the rights of partners with relation to each other is well settled. A partner is an agent of his co-partners in all partnership transactions, and hence can not get for himself, that which it is his duty to secure for the partnership. If he uses the partnership funds in effecting a private enterprise of his own, he may be required to account to his partners for the profits. If he secures a contract for himself, which it was his duty to secure for the partnership, or purchases property, which he should have purchased for the partnership, or engages for himself, without the consent of his co-partners, in a business, which is similar to the business of the partnership, so as to be in competition with it, he may be required to account to his co-partners for the profits. Being the agent of his co-partners relative to partnership matters, he must act in perfect good faith toward them, with reference to such matters. Anderson v. Whitlock, 2 Bush 398; Brown v. Shackelford, 53 Mo. 122; 30 Cyc. 458-459; Bourne v. Wooldridge, 10 B. M. 492; Farmer v. Samuel, 4 Litt. 187; Edelen v. Hagan, 9 R. 862; White v. Jouett, 147 Ky. 197; Lee's Admr. v. Reed, 4 Dana 109. A clear statement of the obligations of one partner to another is made in Aas v. Benham, 2 Chy. Div. 244, as follows:

"It is clear law that every partner must account to the firm for every benefit derived by him without the consent of his co-partners from any transaction concerning the partnership, or from any use by him of the partnership property, name or business connection; . . . . It is equally clear law, that if a partner, without the consent of his co-partners, carries on business of the same nature as and competing with that of the firm, he must account for and pay over to the firm all profits made by him in that business. . . . ."

We should not be understood as holding, that a partner must account to his co-partners for the profits of a venture outside the partnership and not of the character of business done by the partnership, although the partnership contract may require each partner, as in the instant case, to devote his entire time and attention and apply his utmost skill and ability to the partnership affairs. Where such obligation is upon a partner and he devotes his time and ability to a business in which he invests his own funds only, and which is other than the character of the partnership business, his partners can not require an accounting of the profits, but their remedy is of another character. Having concluded, that the transaction in controversy is within the scope of the partnership business and contract of Henning, Chambers & Co., Chambers without the consent of his co-partners, could not enter into it for his own benefit, and although he might attempt to do so, it being in competition with the partnership, it is immaterial whether he used his own funds in the transaction or those of the partnership, as he would be required to make an accounting to the partnership for the profits. The evidence, however, was, that in the purchase of the common stock of the Merchants Heat & Light Co. that Chambers paid $128,293.33. Of which, $8,333.34 was paid on June 17th; $15,000.00 on August 9th; $6,166.66 on September 9th; and $98,855.00 on September 17th. It is, also, shown that on August 8th, a check was drawn by Henning, Chambers & Co., payable to Chambers, and by his direction and upon its account in bank, and was deposited to the credit of Chambers with the Fidelity Trust Company, and his payment, upon the next day, was by check upon the latter company. On September 17th, a check of Henning, Chambers & Co. upon its account, in bank, was drawn by Johnston, by Chambers' direction over the telephone, and payable to the Fidelity Trust Company, for $114,000.00, and it is admitted, that the sum, furnished by this check, was a part of the sum paid by Chambers on that day for the stock of the Merchants Heat & Light Co. In order to enable Henning, Chambers & Co. to make the payment of this check, $47,000.00, to its credit in New York, was withdrawn and deposited to its account, in bank, in Louisville. On the 17th of September, another check for $6,200.00 was drawn by Henning, Chambers & Co. upon its account, in bank, and deposited to the credit of Chambers with the

Fidelity Trust Company. It seems reasonably certain, that, at least, as much as $129,000.00 of the funds of the partnership were used by Chambers in carrying out the deal. After September 17th, during a period of two or three months, Chambers paid different sums for different purposes connected with the deal, to the total sum of $15,803.24, of which a large part was returned to him within a very short time. He began to receive returns from the sales of the stocks of the Merchants Public Utilities Co. after October 5th, and all had been repaid to him and nearly all of the profits received by him, by February, of next year. When the check for $114,000.00 was drawn in favor of the Fidelity Trust Company for Chambers, on September 17th, and charged to his individual account with the firm of Henning, Chambers & Co. it caused his account to show a debit balance in favor of the firm for about $73,000.00. All the checks above mentioned as having been drawn payable to Chambers and for his benefit were charged to him upon his individual account with the partnership. The debit balance of Chambers' account was, however, secured to the firm by stocks and bonds and other securities owned by Chambers and which were held by the firm, in the sum of about $165,000.00, at that time. It is now insisted, that the partnership funds were not used in consummating the deal, because of this large security, which the firm held belonging to Chambers, but it does not appear that the funds drawn and used were not the funds of the partnership or that Chambers had any individual right to them. From the beginning to the end of the partnership, each, of the partners, had on deposit with the firm securities, varying in amounts, from time to time. Chambers usually had with the firm about $100,000.00 worth of securities; Henning, a very large amount; and Johnston an amount somewhat in proportion to his interest in the partnership, and in addition to these securities effecting the purpose of securing the debit balances of the partner with the partnership, they were used by the partnership as collateral securities upon which to borrow money to meet the needs of the partnership in the conduct of its business operations.

(b) It is, also, contended, that the transaction, in controversy, was not a matter within the scope of the partnership, because none of the stocks were to be sold in Louisville, but in the state of Indiana, where the partnership had but few customers or business, and for that

reason it was not conducted in competition with the partnership. While for reasons of their own the dealers had agreed among themselves not to offer the stocks for sale in Louisville, the sale was not restricted to the state of Indiana, and in fact the larger amount of the stocks were sold elsewhere, and the partnership agreement, it will be observed, provided for the partnership engaging in business at any place it chose.

(c) It is insisted for appellant, that the transaction was not of a partnership character, because it was a matter in which the partnership could not participate, for the reason, it is claimed, that an understanding existed between the partners, that the firm should not purchase common stocks of corporations for the purpose of a speculation—that is, to purchase with the expectation of a contingent advance in value and a subsequent sale at a profit, but should confine itself to a strict commission business, with the exception of purchases, at times, of blocks of stocks or bonds, at wholesale prices, to be retailed, as rapidly as possible to customers, at a small profit. No one testifies, that the above was ever actually agreed upon, but it is said to have been understood, and as to how the understanding was arrived at is not explained. This agreement is not in the written evidence of the partnership contract, and there is no contention that there was any agreement to the effect, that when stocks and bonds were purchased that sales should not be made for as much profits as could be attained. The partners, however, seem to agree, that it was the ordinary usage of the firm, not to engage in enterprises of a speculative nature, but, in the prosecution of its business, the partnership does not seem to have adhered to the rule, not to speculate, with any degree of strictness, and the partners differ widely as to what constitutes a speculation, in any particular case, as applied to the facts of that case, as all men naturally must differ about a matter, which is based upon the peculiar opinion of each, and it is evident that every purchase of an article for resale, without a previous contract for its sale at a price, must contain more or less of a speculation.

As heretofore shown, this deal was a purchase of stocks at a wholesale price, to be sold or exchanged for other stocks, which were to be sold, as rapidly as possible, to the general public, each one of whom upon making a purchase became a customer, and for whatever

profits could be realized, and these features, it seems
would bring the transaction within the exception pro-
vided for in the alleged understanding, unless the trans-
action contains such a risk as to make it of too specula-
tive a character to be permissible, as a partnership bus-
iness. The substantial character of the corporation, its
large growth, and earnings and surplus; the steady ad-
vance of its stocks within ten years from their par value
of $100.00, per share, to $200.00, per share, the evident
eagerness of experienced men, of ripe judgment, in such
matters, who had intimate knowledge of the corporation
and its stocks and property, as the dealers in the pres-
ent instance were, to engage in the enterprise of dealing
with its stocks and property, does not seem to justify the
contention, that the risk of participating in the deal was
so considerable, as to make the transaction a specula-
tion, which would remove it beyond the scope of the
partnership. There is no similar transaction in the bus-
iness of the partnership, which was rejected, as being
of too speculative a character, which could be considered
as a precedent.

(d) It is further urged, that the deal was without
the scope of the partnership, because the partnership
was not financially strong enough to have carried the
participation of Chambers in the dealing, but, as it did
provide nearly all of the funds, which were necessary,
and it is shown that the partnership, in the conduct of
its business, often sustained financial responsibility, as
large or larger, in accordance with the manner of its do-
ing business, and the recognized usage of its members
with reference to it, the contention does not seem to
have merit.

(e) During the continuance of the partnership each
of the partners dealt largely upon his own account in
stocks, bonds and other securities, and which trans-
actions were not treated as partnership matters from the
inception to the end, but as individual transactions in
which the partnership had no interest, and this fact is
seriously urged as the basis for the claim, that the trans-
action under consideration was one in which appellant
had a right to engage as an individual and to the ex-
clusion of the partnership, and this it may be said pre-
sents the only real difficulty in the case. The exact
facts, in regard to these transactions, are not shown, ex-
cept in a few instances, which are of comparatively
minor, and inconsequential importance. These trans-

actions of the individual members appear to have been shown upon the books of the partnership, it receiving the commissions, as a broker, for the purchases and sales, and the member treated as any other customer of the firm and the transaction treated as an individual one. The parties seem to consider these transactions as being of a speculative character, as being the reason for excluding the partnership, but whether properly excluded under the partnership contract or not, as they appeared on the books of the firm and the nature of them known to the members and the commissions received from them included in the partnership settlement, it can only be concluded that the transactions were engaged in by the members of the firm with the consent of the other members. The logical consequence of this contention, that because of these individual dealings a partner was entitled to choose whether he would take the benefit of a transaction for himself or permit the firm to have it, is to hold that the partners had by mutual consent abandoned the partnership contract, while pretendedly continuing as a partnership, which neither of the partners pretends was ever done. While it must be concluded, that in reference to the dealings by the individual members of the partnership in the manner and as above mentioned, and with regard to the matters there dealt in, the partnership contract was altered by the acquiescence of the partners and by their tacit consent, there is no warrant for holding, that the partnership contract was further altered and changed with reference to transactions dissimilar in their features, but clearly within the scope of the partnership, and in regard to which, there is no showing, that any such transaction had ever been treated as an individual matter, unless with the express consent of the other partners. There is nothing, in the evidence, from which it can be inferred, that the partnership ever either tacitly or expressly agreed that the written partnership contract should be abandoned, with reference to every kind of a transaction and each partner be at liberty to conduct the partnership business for his own benefit, and to exclude the partnership or permit the partnership to participate in it, as he might choose. It can not be held, unless clearly shown, that the partners did not intend, that the partnership contract should control the conduct of its business and their responsibilities to each

other, except, in instances, where they had agreed otherwise.

(f)  The partnership was dissolved, as heretofore stated, because of the death of Henning, on December 23rd, 1913, and a settlement of the partnership affairs was made as of December 31st, 1913, about the first of February, 1914. A new firm was then organized under the name of Henning, Chambers & Co., composed of Chambers, Johnston and McCraw, which took over the assets and liabilities of the old firm of Henning, Chambers & Co., and continued until in April, when it was dissolved by the retirement of Johnston, and a settlement was made of the affairs of the new firm, which was assented to and accepted by the partners. The two settlements, the one of Henning, Chambers & Co., and the one of Henning Chambers & Co., are both relied upon as defenses to this action. The action does not seek the setting aside of the settlement of Henning, Chambers & Co., nor to surcharge it, but was instituted to recover the profits of one item, only, of the partnership, which it is alleged was not brought into the settlement nor embraced by it. It is affirmatively alleged, that in all other things the settlement was correct. The appellee's contention is, that he was caused to accept the settlement as made, leaving out the transaction, in controversy, because he did not know of the fact, at the time of the settlement, that the partnership was entitled to the profits of that transaction, nor its character, and was deceived into the acceptance of the settlement by the representations and concealments of appellant; while the appellant insists that appellee was fully acquainted with all the facts regarding the transaction, at the time of the settlements and that he neither misrepresented nor concealed anything from him, but that the settlement was advisedly accepted and assented to by the appellee. The general rule, which applies to private accountings and settlements between partners, is, that it is binding and conclusive upon them, in the absence of its procurement by fraud or mistake, and the partner, who impeaches it, must take the burden of showing an inaccuracy in the settlement to which he has assented. 30 Cyc. 703; Shoemaker v. Shoemaker, 29 R. 134; Ferguson v. Hite, 9 Dana 553; Loesser v. Loesser, 81 Ky. 739; Davis v. Ferguson, 29 R. 214; Ehrman v. Stitzel, 28 R. 728. Where both parties are acquainted with the partnership affairs, and neither reposed any special con-

fidence in the other, a partnership settlement between them is considered especially conclusive, but if one of the parties has an accurate knowledge of the business and the facts and circumstances of the transactions, and the cther is substantially without knowledge of it and relies with confidence upon his partner, a settlement is esteemed less conclusive as against the latter. As said in Lee's Admr. v. Reed, 4 Dana 109:

"A settlement concluded between the parties, each of whom may be presumed to be acquainted with the transactions involved, is entitled to great consideration, as furnishing high evidence of the correctness of its results. But it loses much of its authority when it appears, that the matters brought into the account rest exclusively or principally within the knowledge of one of the parties, and are received and admitted by the other, upon his representations. In the first case, however, the settlement is not deemed so conclusive but that it may be impeached on the ground of fraud or mistake; and in the other it is still held to be sufficient evidence of the truth and fairness of its results until fraud or mistake is established. But as fraud may be more easily practiced or mistakes more easily occur in the latter than in the former case, reason as well as authority, indicates, that slighter evidence of fraud or mistake will induce the chancellor to open the settlement and look into the accounts in the one case than in the other."

In the making of the settlements of the partnership affairs, each partner being an agent of the others touching anything within the scope of the partnership business, has a right to rely with confidence upon the other, and to have from the other the fullest disclosures touching any partnership matter, as much as in the conduct of the partnership business, and hence any fraud or mistake, which induced additions to or omissions from the settlements; or where facts, of the partnership business relating to items improperly added or omitted, are exclusively or nearly so within the knowledge of one of the partners, and the other knows but little of them, and they are withheld by the one having knowledge of them, and he secures an advantage by such concealment without having made any misrepresentations; or where an advantage is secured by one partner by a failure of that high degree of good faith and fair dealing, which is required of the partners in transactions with each other, resulting in substantial injustice; or where a mutual

mistake causes an addition to or omission from the settlement; or where a partner is misled by an innocent misrepresentation and a mistake occurs from it, which results in a substantial injustice and injury, relief may be had as to the items, which are improperly added or omitted. Kelly v. Rankin, 163 Ky. 466; Pomeroy's Eq. Jur., sections 891-902; 30 Cyc. 706. The evidence adduced upon the issue made touching the settlements is contradictory and a recitation of it would extend this opinion beyond any reasonable proportions, but it is certain that appellee had no information in regard to the deal, until it had been under way for sixty days, and while the parties differ as to the information conveyed to appellee, at the time, they agree that appellant told appellee that all the partnership could realize out of it were the small fees and commissions, which it would receive, as a syndicate manager. It does not appear, that appellee ever saw or knew the contents of the syndicate manager's agreement, or any of the writings executed by the promoters of the deal, until after the settlements, except the circular issued to assist the sales of the stocks and the accompanying letter of McKee, from which no definite knowledge of the relationship of the partnership to the transaction could have been had. The facts going to make up the transaction, which are shown to have been within the knowledge of appellee, at the time of the settlements, are fragmentary. The transaction was not shown upon the books of the firm, except that portion of it, which the firm conducted as a syndicate manager, and the giving of the $114,000.00 and the $6,200.00 checks, which were made payable to the Fidelity Trust Company and charged to appellant upon the books of the firm. It is not claimed, that appellee knew any of the facts of the transaction, except as appellant communicated them to him, and a conversation with John W. Barr, which seems to have been casual and related to Barr's connection with the deal and showing some character of interest in it by the appellant. Appellant claims to have told appellee about the transaction in November, after the sale of the common stock to Kelsey, Brewer & Co., but this appellee denies. They agree, that appellee became aroused and began an investigation, which culminated, as appellant claims, in two interviews between them, one in November and another at a later period, in which he communicated to appellee all the essential details of the deal, but exactly, what

things, he told him, do not appear. Appellee claims that they had only one interview in regard to the matter and that was in March, 1913, and at which he did not receive definite information as to the relationship of the partnership to the deal, but they agree, that appellant represented that the firm had no interest in the matter and was a transaction in which it could not engage. The appellant knew all about the transaction, and there is no reason to suppose that appellee did not repose confidence in him. Afterwards appellee went to Cincinnati, and interviewed Field, following which he instituted his action. Upon the issue as to whether or not the appellant had such knowledge of the facts as to make the settlements conclusive upon him, upon the contradictory evidence heard, the chancellor rejected the defense based upon the settlements, and giving to his opinion, as to the facts, the credit to which it is due, the judgment will not be disturbed.

The judgment is, therefore, affirmed. Whole court sitting. Judge Sampson dissenting.