## Waterbury et al. v. Waterbury.

March 17, 1939.

As Modified and Extended on Denial of Rehearing May 12, 1939.

WILBUR FIELDS and WOODWARD, DAWSON & HOBSON for appellants.

WALTER LAPP and FRANK GARLOVE for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

The matter presented for solution involves a business engaged in by a father and three sons in the City of Louisville, begun by two brothers in 1919, at which time the mother and the father were about fifty-six years of age. The appellee, Lawrence E. Waterbury, was about 19; Chester about 24; Roy later coming into the business when about 19. In October, 1933, differences had arisen between Lawrence and the others of the family and Lawrence filed his petition in equity, in which he alleged in substance that for "some time past" he and the defendants (excepting the mother) had been engaged as partners in a transfer, coal and supply business, under the name of Waterbury Bros. Transfer Co., each being entitled to a one-fourth interest. The defendants were the father, the two other brothers and the mother. Mrs. Waterbury died dur-

ing the progress of the suit, and it was completed as against her representatives.

It was averred that shortly prior to the bringing of the suit, defendants, partners, had refused to allow plaintiff to continue in the business, and notified him of their desire to terminate and wind up the affairs of what he termed the partnership at will. They had refused to permit him to share in the carrying on of the business, and failed to account to him concerning the activities of the business. In short he said the other members had ignored him and "locked him out." This they denied.

The mother was brought into the suit because plaintiff alleged that for many years the partnership had been investing the profits from the business in real estate in Louisville, placing the title to same in the name of the mother. It was charged that she held the title to some four or five described parcels of real estate as trustee for the partnership, all of which in fact was the sole property of the company, since there was no consideration passing for conveyances to the mother.

It was also charged that the company owned a lot in Greenwood Villa, which, together with the personal property, was mortgaged to the mother for the alleged security of a note for $25,000, and for the execution of which note and mortgage there was no consideration; that no such sum was ever received from the mortgagee, the instruments being executed for the purpose of sequestering the assets of the company into the hands of the mother.

A charge of mismanagement, waste and an intention of disposing of the company's assets was made and plaintiff asked for the appointment of a receiver to take charge of the business. It was further suggested that since the real estate was the property of the concern it should be sold, free from any claim of the mother; general prayer was for a sale of all assets, accounting to plaintiff, and a settlement of the business of the company.

There followed motions to paragraph and make more definite the allegations of the petition. Both being overruled, the defendants filed answer in which they denied the allegations of the pleadings; the defendant, E. J. Waterbury, the father, filed separate answer in which he alleged that since March 8, 1923, he had been

and was at the date of the answer, the sole owner of the entire business of the Waterbury Bros. Transfer Company; that at no time since the date mentioned did the three sons, or any one of them, including plaintiff, own or have interest in the business. He alleged that from the date mentioned up to a certain time, Lawrence had performed services for the company, for which he had been fully compensated. The above pleadings appear to have completed the issues.

On December 22, 1933, the court referred the matter to his commissioner for hearing of proof and to report as to whether or not, at the commencement of the action and prior thereto, there was a partnership existing between the plaintiff and the three defendants, and if so, its nature, terms and conditions.

Later, on December 14, 1934, after hearing considerable proof, the commissioner reported that there was an existing partnership; that each partner was to share in equal proportions, and same had existed under verbal agreement between the members entered into in March 1925. This finding was based on the fact that about that time certain signature cards were filed with a bank evidencing partnership on equal terms.

Following this report by the commissioner, the defendants (save the mother) filed written exceptions, mainly stating that there was lack of evidence to support the conclusions. The exceptions were overruled, the chancellor in a brief opinion concurring with the commissioner. Still later the chancellor directed the commissioner to hold hearings, ascertain and report:

(a) As to the date of dissolution of the partnership.

(b) On the value of all real estate owned by the partnership, held by defendant Barbara Waterbury, and to ascertain and report any and all liens, if any existing; to ascertain what interest the partnership held in the real estate, and the value of plaintiff's interest.

(c) To ascertain the value of all assets of the partnership, taking into consideration the good will of the business, and to make a complete accounting.

(d) To ascertain and report what sum of money would fairly represent plaintiff's interest in the assets at the date of dissolution.

On April 26, 1936, the commissioner, after hearing much testimony, reported in substance that he found the real estate to be of a value of $35,506, all of which was the property and part of assets of the partnership. He determined that the profits from the partnership were placed in the hands of Mrs. Waterbury, and she held and invested the same in real estate in her name. He found existing liens (or lien) against the real estate to be $4,000; this on the Vine Street property. Plaintiff's interest in the real estate was fixed at one-fourth of the total value, $8,876.50.

Commissioner found the date of dissolution to have been June 15, 1933. He found the stock on hand, coal, supplies and raw stock to be of value of $3,207.50; cash on hand, $1,256.55.

Calling attention to the fact that witnesses were unable to make an accurate report of the assets and obligations of the company, due to the fact that there had not been kept books which would reflect the business of the company during past years, or if so kept, same were not produced, he said that he had great difficulty in reaching values, particularly as to the twenty-five or more trucks on hand at the date of dissolution, or appellee's passing out of the partnership. He however, fixed the value of the trucks at $10,000, which he said included an intangible value to a going concern. He valued the good will of the concern at $20,000.

The alleged note of $25,000, executed to Barbara Waterbury, to secure a payment of mortgage executed by the partnership members, was found by the commissioner to have been made without consideration. Total assets were fixed by the commissioner at $68,-106.50. Of this sum the commissioner reported and recommended that appellee's proportionate part was $17,025.64.

Later all the parties defendant to Lawrence's petition filed exceptions, and as the court remarked, they were general in nature, but sufficient to present the controversial points. We need not set them out, since later they will be discussed, item by item. C. L. Woodbury filed separate exceptions on behalf of the estate of the mother, but they seem to be covered in the general exceptions, and only amplify such as related to matters as might affect the mother's estate.

The court in passing on the exceptions wrote an

opinion which is made part of the record, and without quoting we shall make reference to it by items. Taking up the firm assets, the chancellor found some difficulty in checking the "arithmetic" of the commissioner, and could not reconcile his figures with his conclusions. We find that the commissioner had reported the net worth of the concern to be $68,108.50. When the chancellor recapitulated, he found the net worth, using the commissioner's figures, to be $63,969.50, which for the sake of round numbers he treated as being $64,000.

Taking up the various items, we find that the chancellor left the value of the real estate at the figure fixed by the commissioner, $35,506, but deducted $4,000, which was the amount of the mortgage on the Vine Street property. An assistant cashier of the bank which held the mortgage note testified that as of June 1, 1933, the balance due was $4,753.44. This is the most acceptable evidence of the balance due, hence there should be deducted $753.44 from the chancellor's figures, leaving the value of the real estate at $30,753. We find no persuasive evidence to lead us to conclude that the values of real estate were not fair, although as a whole it was listed at about one-half of the value fixed by the commissioner.

The court, following the commissioner's report, found all the real estate as claimed by plaintiff to be partnership assets, though they stood in the name of the mother. We think his conclusion on this point is correct. It is true that the father claimed that he, during his barbering business, and his short stay with the chair factory, had saved $38,000 or more, all of which was turned over to the mother, who year after year kept this accumulating fund until after the father had taken over the business as he claimed, when the two began the purchase of real estate which continued from time to time. The first was the East Chestnut Street property, which appears to have been used as a home for the family. This was bought in 1930, and there is ample proof showing that this was bought with the proceeds of the son Joe's insurance policy, payable to the mother. Whether this was included in the report and ordered in judgment to be sold will be discussed later.

The second parcel was purchased in 1924; the third parcel in 1925, and the Vine Street property in 1926,

and upon this, improvements were later placed at a cost in excess of $5,000. The testimony as to the saving of the unusual amount from the barbering business, during which time of saving the family consisted of the husband and wife, and five growing sons, would have had more weight if the sons and the mother had shown some knowledge of the accumulation of money in the "cedar chest." When we analyze the entire testimony, giving it a most favorable consideration, it seems clear that the greater portion of the money kept by the mother was that which had been turned over to her by the son Chester, and came from the operation of the transfer business. We find little difficulty in concluding that the real estate, with the exception noted, purchased in the name of the mother, was without consideration.

The chancellor held that appellee's share of the partnership should not be reduced by the partnership salary paid to him. The proof showed that from 1919 to 1933, date of alleged dissolution, Lawrence received weekly compensation of seven, ten, and twenty-four dollars per week. There is little proof as to total amount paid, or as to the part of the entire period covered by differing amounts paid, a part of which was during the time when Lawrence and Chester were conducting the business, and when it was said "it was a family affair." This matter was not treated of in the commissioner's report, and could only arise under the general exception that Lawrence's share of the assets had been placed too high.

As we read the record it appears that Lawrence was the outside man; not only driving trucks, soliciting orders, but doing all the c.o.d. collections, and seeing that other accounts were paid. No other partner, or member of the firm drew any fixed compensation, although each of them appears to have been living off the profits of the business, without any showing or effort to show an accounting.

It was nowhere claimed that the compensation for the work done by Lawrence was treated, or was to be treated, as an advance against capital. For a part of the time at least, Lawrence was doing the greater part of the actual work, and using his efforts in producing business. From the start until either 1926 or 1928 Chester was only giving his spare time, mostly at night, in keeping books, and during these periods he was working for the L. & N.

Roy was a truck driver, and the father drove a truck, looked after repairs, and did some soliciting. Although claiming to own the business after 1923, his evidence shows that he had a meager knowledge of the company's affairs. So, in the absence of a claim by exception, or evidence showing otherwise, the salary paid to Lawrence cannot be treated other than as compensation paid under contract.

As to the value of good will, the commissioner took what he deemed profits of the year 1930, $11,387.31, as a criterion, and multiplied that sum by 5, reaching the result $56,000, which, if assuming that to be the good will of the business, entitled Lawrence to an allowance of $14,000. This the commissioner thought (as we think) out of proportion. He did not take into consideration the profits (or losses) of any year save 1930. He suggested that another method was to take ten per cent of the average profits over a series of years, as being illustrative of the good will. However, the commissioner, believing that value too high, arbitrarily fixed it at $20,000, allowing Lawrence one-fourth, or $5,000. The court followed the commissioner. He suggested another method of reaching the value, but it is clear that to fix the value of the good will, as was done by the chancellor, would also be out of proportion.

There is no fixed standard by which courts, or others for that matter, may determine the value of good will. There is always an uncertain element entering into the value, which is to be considered. In a recent work the question of good will value is fully treated, perhaps more from an economical than strictly legal standpoint. We quote from Vol. 2, p. 727, Valuation of Property, Bonbright:

"In a recent case, chief justice Cardozo, writing for the New York Court of Appeals, spoke of good will as follows: 'Men will pay for any privilege that gives reasonable expectancy of preference in the race of competition. Such expectancy may come from succession in place or name or otherwise to business that has won the favor of its customers. It is then known as good will.' Matter of Brown, 242 N. Y. 1, 150 N. E. 581, 44 A. L. R. 510. Despite the broad introductory sentence, the statement harks back to Lord Eldon's classic dictum that the essence of good will is the probability that

old customers will return to the old stand. Crutwell v. Lye, 17 Ves. Jr. 335. Justice Cardozo thought of other things as attracting customers besides the accustomed location, but nevertheless he confined good will to such things as retain the favor of old customers. * * * Sir John Rommily said: 'It varies almost in every case, but it is a matter which may be preserved (at least to some extent) if the business is sold as a going concern, but which is wholly lost, if the concern is wound up." Weddeburn v. Same, 22 Beav. 84, 104 (1856).

The author points out that the New York authorities "have worked out a method of valuing good will in elaborate detail, which has been applied to the usual run of cases." The first step is to average the net earnings for a period of years before dissolution. "Annual depreciations may, of course, be deducted to find net earnings, * * * if the decedent was receiving an adequate salary, but if he contributed markedly to the success of the business, an allowance for the loss of his services may be included in the calculation of good will value. Matter of Bijur, 127 Misc. 206, 216 N .Y. S. 523. * * * The number of previous years which shall constitute the period during which net earnings are to be averaged is subject to no set rule. * * * Decisions have employed from 1½ to 12 year periods, with 5 years perhaps the most popular." The author cites a number of cases on this point under note 112. A percentage of the average net earnings is applied, but this varies. The author gives other formulae, one adopted by the U. S. Treasury, p. 1061, Vol. 2. The writer has reference, perhaps, to the rule adopted by the Internal Revenue Department, known as A. and R. Mem. 34. In substance this provided a formula which consisted in capitalizing the excess of earnings over a reasonable return on the value of the tangible property at a certain percentage. The percentages most frequently employed are a reasonable return on tangible property at 10%, the excess over 10% to be capitalized at 20%. Since there is not sufficient data upon which to make an estimate here, we do not exemplify the formula. The application of the rule may be noted in Pfleghar Hardware Specialty Co. v. Blair, 30 F. (2d) 614; In Re Hall's Estate, 94 N. J. Eq. 398, 119 A. 669; White and Wells Co. v. Commissioner, 50 F. (2d) 120.

It appears that the Commissioner had in mind this

rule, but was unable to apply it because of the lack of data. However, the difficulty in applying any suggested plan in this case is due to lack of proof, and an absence of books or reports for any period of years which would authorize the court to adopt or apply any particular method. One thing we have concluded, and that is the value of the good will as fixed, at first blush seems to be too high. There was no testimony as to net earnings, except as reflected by three income tax reports filed as exhibits for other purposes. The commissioner, accepting the one for 1930 as a partial working basis, suggested that in that year the net earnings were $11,387.31. He evidently took gross profits, since the return on its face shows a net of $7,390.01. He did not consider the returns for 1931 and 1932; in the one there was a loss of $805.83, and in the other a profit of $540.85. The court may assume that there was a profit in the years 1928 and 1929, since the proof seems to indicate growth, and during the period a smooth running business. The court takes judicial knowledge that 1933 was a lean year and one of loss, unless by some remarkable circumstance it were shown to be otherwise.

In the absence of proof, book showing, or tax reports for others than the years mentioned, and without adopting any particular method of arriving at the good will in the partnership, which was continued after 1933, we have reached the conclusion that the good will of the concern was approximately $10,000. In reaching this conclusion we have assumed that there was some profit in 1928, 1929 and 1932; a loss in 1931 and 1933, a portion of which, the first half at least, is to be considered. But another element is Lawrence's withdrawal or elimination from the business. The proof shows that from the beginning he was the chief factor in building up the business. It is shown that before Chester would agree to go in with him he had to secure customers sufficient to justify Chester in agreeing to assist in starting the adventure. During all times he was the outside man, having the personal contact with customers. These customers were gained and perhaps held by this contact. They had none with Chester; very little with the father, perhaps more with Roy.

The court found the value of the trucks on hand as of July, 1933, to be $10,000. He arrived at these figures by averaging the estimated value fixed by Lawrence at $15,000, and by the father at $5,000. Lawrence's esti-

mate was based on his idea that each truck was worth $500 as of June, 1933. He overlooked the fact that he had previously fixed the number owned as of July 1933, at twenty. The father's estimate of $5,000 appears to have been based on the number owned at the time he gave his deposition, when there were more than twenty. He did not give an estimate on the value of as of 1933.

As we read the proof, we find that two witnesses, whose business was dealing in trucks, experienced in the traffic of used truck valuations differed, and were much lower than the court fixed, both valuing them at approximately a little less than $1,000. This is too low. It appears that few if any of the trucks were of late models; many were more than ten years old. All these facts, and the testimony of those skilled in the business, should have been considered in fixing their market value. We agree with the commissioner that the value should not be fixed at what the trucks would bring either at a forced or a voluntary sale, since they would have further value when used by a transfer company in carrying on its business. Chester testified that in 1932 only eight trucks were licensed to operate, the rest of them standing idle in the garage. We have concluded, considering all the testimony relative to truck values, that a fair valuation as of the date involved is $5,000.

The court in treating of the alleged mortgage note of $25,000 on real and personal property (trucks) followed the commissioner's conclusion, that the note was without consideration, except as to the sum of $2,000, which was offset.

In the judgment it was stated that the partnership terminated on June 15, 1933. Petition was filed in October, 1933. The judgment allowed interest from June 15, 1933, until paid at 6% per annum. In appellee's petition he sought a full accounting, appointment of a receiver (though no receiver was appointed) and for a sale and distribution of the assets. No interest was asked in appellee's prayer.

It is strenuously contended by appellant that interest should have been allowed only from the date of the judgment, because of the rule which it is contended is applicable here, that interest will not be allowed, nor is it recoverable on an unliquidated claim. Scanlon-Thompson Coal Co. v. Lick Branch Coal Co., 243 Ky. 100, 47 S. W. (2d) 1007, and cases cited. It is also con-

tended that "interest is not generally allowed upon partnership accounts until after a balance has been struck on settlement." 47 C. J. 777.

Counsel for appellee contends that interest was properly allowed from the date fixed in the judgment, which date the Commissioner and court below found to be the date of dissolution. The contention is based upon a rule laid down in 47 C. J. 876, wherein it is said:

> "Ordinarily interest is not allowed on unascertained balances remaining in one partner's hands after dissolution of the firm. But where the circumstances are such as equitably to demand payment of interest, it will be allowed from the time when the partnership accounts should have been settled, as where one partner has retained the money an unreasonable time, or where he is wrongfully withholding it. A partner may be entitled to interest on ascertained amounts due him from the date of dissolution or from the date of judicial demand for payment."

It is argued that since the proof showed that appellee was "locked out" the "circumstances were such as equitably to demand payment of interest * * * from the time when the partnership accounts should have been settled" as in a case where one partner has retained the property or money for an unreasonable length of time. We do not think, under the proof, the latter rule should be applied in this case. The proof of appellee, he alone testifying, is to the effect that he was denied participation in the business. The contrary is developed by more than one witness (all interested) for appellants. They say that appellee, after he "walked out", never offered to return, though they were willing at all times that he should, or agreed that he could, come back and resume his status. Appellee, when testifying, a long time after he had brought his suit, said:

> "Nothing has been accounted for at all; I haven't been up there even; in fact I haven't been around the company at all since I left, since June."

Neither the Commissioner nor the chancellor passed on the question as to whether the "dissolution" of the partnership was brought about by any untoward act of the appellants or the appellee. The determination of

the question of "fault" was not submitted to the Commissioner either on the first or second reference, hence we are not persuaded by any finding nor is it necessary for us to review the evidence, which tends to show that the moving cause of the dissolution consisted of several matters of disagreement among the partners, not all relating to the conduct and management of the business. It suffices to say that as we view the evidence the weight shows that Lawrence was not driven out of the business.

Upon consideration of the question of allowance of interest, we have concluded that the court was in error in allowing same from the date upon which the Commissioner found the dissolution to have taken place, but that same should have been allowed from the date of judgment. Jones v. Jones, 254 Ky. 475, 71 S. W. (2d) 999; Noel's Adm'x v. Black's Adm'r, 244 Ky. 655, 51 S. W. (2d) 955, Spalding v. Spalding's Adm'r, 248 Ky. 259, 58 S. W. (2d) 356.

It is also contended by one of the partners, appellant, that the assets of the firm should have been reduced by the sum of $18,000, or more, because of contributed capital. The commissioner found against this claim, and the chancellor sustained his finding, the former giving a very substantial reason for so finding.

We have no hesitancy in refusing to reverse the court's finding on this item. In the first place the pleadings, rather than justifying such claim, afford ample ground for its disallowance. In answer to appellants' petition, there was merely a denial of the formation or existence of a partnership. Mr. E. J. Waterbury filed his separate answer in which he lay claim to the entire business; he claimed sole ownership from a fixed date. The claimant of the contributed capital failed to respond to that pleading, thereby admitting the father's alleged ownership.

Furthermore, when testifying he unqualifiedly stated that all interest in the concern which he had ever had was turned over to the father, and that he expected nothing out of the partnership. His only expectancy was such as his part of the estate of the mother and father might be upon their deaths.

We have rarely had a case before us where there was so much contrariety of evidence, and such a peculiar, and we may add, a more unfortunate situation. Here we have one son claiming a partnership; composed

of two brothers at first, then later the other son and father were included, and thereafter the partnership was to be conducted on terms of equality to all. The father contends that after March, 1923, he became the sole owner; that he and his wife had contributed largely to the purchase of the real estate, and it was for this reason he was given the property.

It is interesting to note the father's testimony as to just how the adventure came to be the sole business of E. J. Waterbury. Asked how it happened, he said:

"They gave me some bills to collect and I took them to a friend of mine, and he asked me if we had ever been incorporated or ever formed a partnership of any kind. I told him we had not. He told me we had better do this part of it before we brought any suit of any description. * * * So, I went back and explained to Chester the conversation I had with this attorney, and he told me to go down and register the business; said 'you can have my part of it; take charge of the business.' "

Another feature is the mother's position in the matter. While it is shown by the evidence that she was rendering some service, and, perhaps, allowing some of her property to be used in the conduct of the business, it is not claimed that she was a partner. However, it may be well concluded from the evidence that she invested about $2,000 in the early part of the business. The partnership should be charged with $2,000, and the amount taken from the assets.

After giving this matter very careful attention and consideration, we have concluded that the chancellor should have fixed the value of the trucks at $5,000; the good will at $10,000. He should have allowed an additional charge against the assets of $753.44, not considered in the allowance for balance due on the mortgage debt, and the $2,000 mentioned above. This would result in a reduction of the assets by (round numbers) $17,750, leaving the value of the assets $46,250, of which Lawrence is entitled to, and should be adjudged one-fourth, with interest from date of judgment.

There is much contrariety of opinion expressed as to whether or not the court directed a lien against Mrs. Waterbury's parcel of real estate. It is contended by appellants that it was so ordered, and by appellee that

it was not. We are unable to determine from the record just what happened in this respect. In order that there may be no mistake on this matter it should be referred to the commissioner for proof and report, unless the parties can agree, and if the judgment is erroneous it should be corrected in this respect. The result may make a slight difference in the value of the real estate considered in fixing the total assets, but perhaps not enough to be of consequence.

Judgment is reversed with directions to enter judgment in accordance herewith.