## Moore's Estate (No. 2).

*Partnership—Dissolution — Settlement — Estoppel — Trade-marks — Laches.*

1. Where a partnership agreement provides that upon the death of either partner the surviving partner may take over the business as a going concern, using the deceased partner's share "in the money in loan account, assets and property of the firm," being required to compensate the estate of the deceased partner therefor, with a further provision for an appraisement of "the stock on hand and merchandise assets," an appraisement made in accordance with a construction of the agreement, accepted and acquiesced in by all parties in interest for a period of six years, which does not take into account the trademarks and good will of the firm, is conclusive.

2. Courts are not disposed to look with favor upon attempts to question a private settlement between partners which are not made promptly. Hence, if a partner, or one claiming through him, permits a settlement to stand for a long time unquestioned, his laches will bar an action to open it or set it aside, unless the delay is satisfactorily explained.

Argued March 29, 1910. Appeals, Nos. 12 and 13, March T., 1910, and No. 101, Jan. T., 1911, by Henry G. Moore et al., from decree of O. C. Phila. Co., July T., 1898, No. 56, dismissing exceptions to adjudication in Estate of Andrew M. Moore, deceased. Before FELL, C. J., POTTER, ELKIN, STEWART and MOSCHZISKER, JJ. Affirmed.

Exceptions to adjudication of fifth account of executors.

The facts appear in the opinion of the Supreme Court and in Moore's Estate, ante, p. 516.

*Dimner Beeber* and *V. Gilpin Robinson*, with them *W. H. Woodward, John M. Gardner* and *John G. Kaufman*, for appellants.

*H. Gordon McCouch* and *Ira J. Williams*, with them *Wm. Rudolph Smith* and *Simpson & Brown*, for appellees.

OPINION BY MR. JUSTICE POTTER, July 1, 1910:

Of the various claims made by appellants in this case, the first is that the accountants should be surcharged for failure to secure for the estate of Andrew M. Moore, deceased, the value of decedent's share of the good will of the business of Moore & Sinnott, and the value of the trade-marks, leases, etc., owned by the firm, with the exception of the lease of the Gibsonton mills, which latter by its terms inured to the benefit of the surviving lessee. The determination of this question depends upon the proper construction of the partnership agreement which was entered into between the partners. The

original agreement between Moore and Sinnott provided that in the event of the death of either partner the survivor should have the right to continue the business on his own account, using "all the assets of the copartnership and the funds invested and employed therein," including the deceased partner's "share of the copartnership capital funds and assets," paying the representatives of the deceased partner the value of such funds and assets with interest, by annual payments during a period of six years. By an amendment to the third paragraph of the partnership agreement, the survivor was permitted the use of the deceased partner's share "in the money in loan account, assets and property of the said firm," and was required to "pay interest on the value thereof as appraised, as hereinafter provided," with certain enumerated exceptions, and also to pay the principal in five annual installments.

By the fourth paragraph of the agreement, which was not amended, it was provided that upon the death of either partner the survivor should "cause the stock on hand or merchandise assets of the firm to be appraised by two disinterested parties," and duplicates of the appraisement to be furnished the surviving partner and the representatives of the deceased partner. This was the only provision as to an appraisement. Immediately after the death of Andrew M. Moore, the surviving partner (Sinnott) notified the executors of his intention to take the business under the terms of the partnership articles.

On February 14, 1898, the executors wrote the counsel for the three sons of testator that Sinnott had requested the estate to name one of the appraisers, and requested suggestions as to the person to be named. On February 17, 1898, the executors notified the same counsel that two persons, naming them, had been selected as appraisers. An appraisement was made by the appraisers thus mutually selected, and subsequently the books were examined by expert accountants employed by both parties,

and an account was made up, which was accepted as a basis of settlement by Sinnott, and by Moore's executors. This account showed the net amount of Moore's interest in the firm assets, to be $29,049.93, subject to deductions for bad debts. Neither good will, trade-marks and brands nor firm name were included in the appraisement, at least as separate items, nor does it appear that Sinnott was charged with any sum on these accounts. Notice of the result of the appraisement seems to have been given to counsel for the sons, as appears from a letter of Samuel B. Huey, Esq., in which he expresses surprise at the result. This letter was dated March 9, 1898.

The first account of the executors was filed in 1899. At the audit two of the sons were represented by counsel. Both in the testimony and the adjudication, the appraisement and settlement with Sinnott were referred to, but the auditing judge excluded the matter entirely from his adjudication, striking out the charge of $29,049.93, for the net value of decedent's interest in the firm, and leaving it for a later accounting. No request was made to surcharge the executors for the value of the good will, trade-marks, etc., or for any sums based on alleged errors in the account which was the basis of the settlement. On December 21, 1899, in response to a letter from Mr. Huey, who represented George M. Moore, counsel for the executors by letter notified him that Sinnott had "purchased" Moore's interest in the business at the appraised value of $29,049.93, and was paying interest on that sum, and on November 10, 1899, the executors furnished to Messrs. Budd and Ziegler, counsel for Albert H. Moore, a complete copy of the appraisement and statement, showing how the balance of $29,049.93, was reached.

A second account was filed by the executors in 1900. At the audit before President Judge HANNA, all three sons were represented by counsel. The entire subject of the appraisement and the settlement was gone over in the testimony at this audit; Sinnott himself, who was

then living, being a witness. No question was raised as to the correctness of the appraisement, or the binding effect of the settlement. On the contrary, counsel for Albert H. Moore apparently acting with the concurrence of counsel for the other two sons, expressly asked that the executors be surcharged with "the outstanding interest in the firm of Moore & Sinnott, as shown by the appraisement and report furnished by John Heins & Company, amounting to $29,049.93, as of December 31, 1898." Counsel for the sons also asked that the executors be surcharged with the securities of Moore which had been pledged as collateral for the speculative firm notes, or with their value, for the reason that it appeared in the account of Mr. Heins that the debts for which those securities were pledged had been assumed by Mr. Sinnott in the accounting. There was no request to surcharge the accountants for any amount on account of good will, trade-marks, firm name or any other matter, not contained in the appraisement and the Heins account.

The auditing judge refused to surcharge as requested, and exceptions to his adjudication were dismissed by the court in banc. On appeal by George M. Moore to this court, the following assignment of error was filed: "The court erred in dismissing the third exception to the adjudication, which was as follows: 'III. Because the learned auditing judge did not surcharge the executors with the difference between the value of the decedent's estate in the whisky business of the firm of Moore & Sinnott, as shown by the account stated of Mr. Heins, Appendix, p. 21, viz., $376,581, and the amount the executors agreed to accept therefor, $29,049.93, to wit, $347,531, it appearing from the evidence that the debts of Moore & Sinnott so charged off against the decedent's interest in obtaining the said valuation of the decedent's interest, have not been actually paid by the surviving partners, and remain as outstanding debts of the decedent with his individual collateral pledged therefor.'" This showed full knowledge of the situation.

A third account was filed by the executors in 1903; a fourth account in 1904, and the present proceeding was the adjudication of the fifth account of the executors. In this proceeding the auditing judge held that "no question can now arise as to the propriety of the settlement made (by the executors with the surviving partner). That matter has been settled for all time by the adjudication of the second account, the audit of which was had June 7 to 13, 1900. At that audit Mr. Sinnott testified that he owned the business in his own right, February 1, 1898, and had agreed to pay to the Moore estate $29,000 (approximately), subject to deduction for bad debts, according to the terms of the agreement, and had also agreed to assume all liabilities. Mr. Dale of counsel for the executors, put in evidence all the various agreements hereinbefore set forth. Mr. Divine of counsel for George M. Moore, offered in evidence copy of the apportionment and appraisement of the account of Moore & Sinnott, made by Mr. Heins; also appraisement of the interest of Andrew M. Moore in the firm of Moore & Sinnott; while Mr. Huey offered the letter from Mr. Dale, dated November 11, 1899, and Mr. Dale went on record with this admission: 'We will stand on the letter as an absolutely correct statement of the facts therein contained.' Mr. Divine also offered in evidence a list of the outstanding securities belonging to the estate of Andrew M. Moore aggregating upwards of $609,000, with a specific request that the executors should be surcharged with them. The three sons were all represented by counsel, and two of them took appeals to the Supreme Court. In the 'paper-book' of George M. Moore and Albert H. Moore the will, all the agreements, the Heins apportionment of account of Moore & Sinnott, the balance sheet, amended balance sheet, and the letter from Mr. Piggott and from Mr. Dale and Mr. Huey were printed as exhibits, together with a summary of the speculative accounts and notes."

As the auditing judge says, the law of this case is

found in the agreement. Under it the survivor had the
right to continue the business, as it had been carried on
by the partnership, and to take it over as a going con-
cern. He was to cause "the stock on hand, or merchan-
dise assets of the firm to be appraised," and that ap-
praised value was what he was to pay for. The use of
the term "merchandise assets" limits the appraisal to
the goods themselves. The appraisers may have taken
into account the fact that the merchandise would be
sold in connection with an established business, and un-
der well-known brands, which would make them more
valuable; but whether they did so or not, does not appear.
We agree with the court below that in this case the ques-
tion of the value of the good will as a separate asset does
not arise. We regard the action taken by the parties
at the time of the appraisement, and their subsequent
acquiescence in what was done, as binding upon them.
The first demand made by any of these appellants upon
the executors for any accounting for the value of the
good will, trade-marks, etc., as separate assets, seems to
have been made through counsel for two of them upon
March 15 and April 7, 1904, after three accounts of the
executors had been filed and audited.

The construction placed upon the articles of partner-
ship, when the appraisement was made, and the busi-
ness was taken over by Mr. Sinnott in 1898, was not an-
tagonistic to anything expressed in the agreement, and
it seems to us to have been in harmony with the purpose
and intent thereof; and especially in view of its accept-
ance and long acquiescence therein by the parties in-
terested, the construction adopted is entitled to great
weight. The personal representatives of the deceased
partner were familiar with the circumstances of the
partnership, and they agreed with the surviving partner
that a proper construction of the partnership agreement
carried the right to continue the business, and to enjoy
the good will, trade-marks, etc., without special compen-
sation therefor. This practical construction placed upon

the agreement was also known to the three sons of Andrew M. Moore, the present appellants, and it does not appear that they raised any question as to the good will, etc., not having been properly appraised, until more than six years after the date of the settlement. There was no concealment as to what was done, and the surviving partner dealt with the other executors who were not members of the firm. Under these circumstances we think that as was said by Chief Justice FULLER, sitting in United States circuit court of appeals, 7th circ., in Holladay v. Imp. Co., 57 Fed. Repr. 774, "If the executor and the survivor in good faith, come to an accounting respecting the partnership affairs, and settle the same as a final account such settlement cannot be overhauled, except on the ground of fraud (or such unfairness as is equivalent thereto) or mistake." And a sound principle is thus stated in 30 Cyc. of L. & P. 705: "Courts are not disposed to look with favor upon attempts to question a private settlement between partners which are not made promptly. Hence, if a partner, or one claiming through him, permits a settlement to stand for a long time unquestioned, his laches will bar an action to open it or set it aside, unless the delay is satisfactorily explained."

In view of the fact that there was an article of agreement in this case providing for the taking over of the business by the surviving partner, and specifying what should be appraised as assets of the firm, and in view of the further fact that the appraisement was made, in accordance with a construction of the agreement accepted and acquiesced in for so long a time by all parties in interest, we do not feel called upon to determine to what extent the good will of the business might have been valuable as an asset to be accounted for, in the absence of a partnership agreement, under which it was assumed that the good will passed under the purchase of the tangible assets.

Under the seventh assignment of error, counsel for ap-

pellants maintain that in making up the balance sheet as of date January 31, 1898, the expert accountant charged A. M. Moore twice with his share of Reading pool notes, and that the result was an error of seven-sixteenths of $432,200, or the sum of $189,087.50, against Moore. It might be sufficient to say again, that the settlement between the executors and Sinnott must be regarded as conclusive, and not now open to attack. But the large amount involved, and the gravity of the error, if it exists, has led us to carefully re-examine the basis of the settlement, with the result that in so far as we have been able to discover, there is nothing to justify an inference of a double charge against Mr. Moore. Prior to January 31, 1898, payments for account of the partners had been made to the old Reading pool, amounting to $902,581.78. This amount was advanced for the benefit of the partners equally, and might have been charged to them at the time as so much cash. But it was carried upon the books, until the reorganization of the Reading railway, and then the amount was charged off, one-half, or $451,290.89, to each partner. That entry had no relation to the payment of any outstanding firm notes; it was merely to cover that much money taken from the firm by each partner. For the firm notes which had been issued for borrowed money, there was of course a liability upon the part of both of the partners. But this charge of $451,290.89, was for funds actually withdrawn by, or on account of each partner, just as much as though it had been paid in currency. It was unfortunately invested by them in Reading stock prior to the reorganization, and thus lost; but the principle is just the same as though it had been invested by them in government bonds, and locked up in the strong box of each partner. Counsel for appellants seem to have been confused by the book entries for this transaction, and were led to regard it as being a charge for the share of each partner for the payment of outstanding notes, whereas it was a charge for funds withdrawn from the

partnership.  If this statement of the situation is correct, then there is no cause for complaint by appellants with regard to the apportionment of the liability of each partner upon the outstanding firm notes.  In other words, if the charging off—on the books of the amount of the old Reading pool—had no relation to the payment of firm notes, then there was no duplication of charge against the estate of A. M. Moore.  For the reasons just stated, we are clear that there was no such duplication.

The question raised by the fifteenth assignment of error, as to a slight error in calculating commissions, has, as we have been informed, been corrected.  So also with regard to the amount of $5,008.65, claimed as a surcharge under the nineteenth assignment.  That we understand from the statement in appellee's paper-book, has been paid by the estate of Sinnott to the Moore estate.

The claim of appellants with regard to the reduction of the allowance for counsel fees has been discussed and disposed of, in the opinion just handed down in the appeal of the executors from the decree of the court below in this case.  In the present appeal, the assignments of error are all dismissed, and in so far as the questions raised by them are concerned, the decree of the orphans' court is affirmed.