## O'Brien v. O'Brien et al.

June 19, 1942.

As Modified and Extended on Denial of Rehearing March 26, 1943.
As Extended on Denial of Further Rehearing June 25, 1943.

794

Wilbur M. Brucker, Rodes K. Myers, John B. Rodes, H. B. Kinsolving, Jr., and John M. Berry for appellant.

Crawford, Middleton, Milner & Seelbach, Thomas A. Barker, Allen, McElwain, Dinning & Clark, and Davis, Boehl, Viser & Marcus for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

This is a suit by Mrs. Patricia R. O'Brien, sole beneficiary of the will of her late husband, John A. O'Brien, to rescind an executed contract of sale of his interest in the partnership of E. J. O'Brien & Company, upon the ground of fraud and deceit. It is prosecuted against his former partners, who are his brothers, and the executors of the will of his mother who had also been his partner. The administrators with the will annexed of John A. O'Brien, who declined to bring the suit, are also parties defendant. The case involves much more than a simple bargain and sale. There are perplexing complications not presented in an ordinary case of this kind. Other than important questions of partnership values and accounting, there is involved a compromise and settlement of claims based upon John A. O'Brien's will and a trust of the proceeds of $200,000 life insurance. After an extensive trial, the chancellor denied the plaintiff's prayer for relief, and she appeals. As the contract was between strong business men of large influence on the one side, and a widow, inexperienced in business and finance on the other, we have scrutinized every point with that degree of care which such circumstances demand of a court of justice. But to keep the opinion within reasonable bounds, we omit much detail and relate only the more important matters in general. We can state but little more than our conclusion as to some of the facts.

The business of the partnership is probably the largest of its kind. It is that of loose leaf tobacco brokers and wholesale merchants, with its principal office in

Louisville. It has branches in other states and connections and transactions abroad. The business was established in 1880 by Edward J. O'Brien. As his sons grew to manhood they were associated with him and later became his partners, first in a limited way and afterwards in full. Edward J. O'Brien died in 1928. Amended articles established a partnership between his widow, daughter and four sons. The daughter sold her interest to her brothers, and from January 23, 1931, the firm consisted of the following, with their respective percentages of interest, namely, the mother, Mrs. Elizabeth G. O'Brien, 15 percent; each of the four sons, Edwin J. O'Brien, Joseph B. O'Brien, James G. O'Brien and John A. O'Brien, 21¼ percent. These are the basic percentages upon which the distribution of profits was made. The proportions of the capital investment were different by reason of the difference in withdrawals and charges against the partners' respective accounts, the aggregate balances of which constituted the firm's capital. In addition to large investment in the physical properties of the firm and those of its wholly owned subsidiaries, and seasonably in tobacco, the company held title to stocks and bonds averaging through the course of later years around $1,000,000 in value. It appears that some of the personal affairs of each partner were handled by the company's bookkeeping staff or were cleared through his account.

Edwin J. O'Brien was the manager and guiding genius of the business. James spent most of his time in France and elsewhere in Europe where the company had large contracts, including those with the French government, which had been a profitable customer for forty years. Joseph had an independent, individual business and did not participate actively in the management of the partnership. John, the deceased, was the youngest brother. The degree of his activities in the company's affairs from the time he left college about 1922 until 1932 is not certain. Late in that year he ceased all activity because of the condition of his health. He died January 1, 1934, at the age of 34 of tuberculosis to which alcoholism was a contributing factor.

The articles of co-partnership of date January 23, 1931 (then amended and re-adopted on the withdrawal of Mrs. Marie O'Brien Michael, daughter and sister of the other partners), provided that the firm should con-

tinue for a term of 50 years if any two of the members should live so long. Important provisions of the partnership agreement are as follows:

"Article 5. The death of any partner hereto shall not terminate the partnership.

"Article 6. In the event of the death of any partner his or her interest shall remain in said partnership until Five (5) years after such occurs, and in the event the surviving partners, before the expiration of Five (5) years, elect to admit the representative of said estate to membership, then papers shall be drawn in accordance with this Agreement and the terms at that time agreed upon, but until the admission of such representative to the firm, the estate, or its representative, shall be a silent partner only and shall not be entitled to participate in the management and the personal representative shall accept statements rendered by the partnership as final and conclusive. In the event the estate elects to withdraw from the partnership at the expiration of Five (5) years, then the interest of said decedent shall be the value of the interest, as shown by the books of the Company, or by appraisement, plus profits and interest, if any."

Thus the death of John A. O'Brien did not work a dissolution of the partnership, as is ordinarily the case, and his estate continued in the partnership until there should be a sale of that interest or a termination of the partnership by agreed dissolution or incorporation as is elsewhere provided for in the articles of co-partnership.

It is necessary to refer to some apparently shameful occurrences for an understanding of conditions and negotiations for the purchase and sale of the estate's interest.

For sometime there had been an estrangement between John and his brothers, especially Edwin and Joseph. They denied this, but its existence is clearly established, the degree only being uncertain. According to a friend he had said he had not spoken to his two brothers since their father's death in 1928. Early in 1933 John went to what is called a physical training camp in New York for several weeks. He had been there in 1931. Not long after his return to Louisville an attendant from that institution came to care for him

800

in his home. He improved to such an extent that in April he went to the firm's office for a day or so, but did not continue going because, as he reported, of the attitude and mistreatment of his brother, Edwin. On the afternoon of June 20, 1933, while his attendant was away on vacation and his wife absent for a half hour or so, John disappeared from home. Mrs. O'Brien and her attorney went to the company's office that afternoon to inquire about her husband and Edwin refused to tell them anything. Mrs. O'Brien located him at the home of his brother, Joseph. She and two friends went there the next morning but were denied admittance, being told by both Mr. and Mrs. Joseph O'Brien that we was too ill to see anyone. They had the same experience on a later visit. On both occasions there were four khaki-clad armed men in the hall and on the outside. Mrs. O'Brien tried repeatedly to see her husband or talk with him over the telephone but she did not succeed. On August 3rd she found him in the Seelbach Hotel in a very bad condition. His doctor testified that he had not expected him to live through the night. The only denial of all this is Joseph O'Brien's testimony that when he went home from the office one afternoon, between June 20th and 25th, he found his brother, John, there; that he left and returned when he pleased, and finally left when Mrs. Joseph O'Brien went to North Carolina about the middle of July. There is no intimation throughout this large record of any other than an affectionate relation between John and his wife, whom he married in 1925.

During this period of his absence from home, namely, on July 7, 1933, John A. O'Brien executed a trust agreement with the Louisville Trust Company as trustee, undertaking to dispose of the proceeds of $200,000 life insurance. It omitted his wife, who was named in the policies as either sole beneficiary or an annuitant during her life. These policies or most of them had been acquired in 1928, within less than three years of his marriage. The trust was for the benefit of any child or children, but if none lived to be 25 years of age or had died without descendants the entire trust estate was payable "in equal shares to such of the blood relatives of the assured as shall then be partners in the firm of E. J. O'Brien & Company." On the same day John A. O'Brien executed a will bequeathing to his wife his automobile, household goods, and one-half of his personal estate, "including one-half of my interest in the partner-

ship of E. J. O'Brien & Company." The disposition of the remainder was the same as that provided for in the trust agreement. The will made special reference to the terms of Article 6 of the partnership agreement and provided that the Trust Company, as trustee under the will, should receive testator's share of the profits during the five-year period.

The execution of these papers is surrounded by mystery. George D. Caldwell, Vice President and Trust Officer of the Louisville Trust Company, testified that in the afternoon of July 7th he was called by Joseph Laurent, attorney, since deceased, and told he was sending John A. O'Brien to see him. When he arrived he had already executed the will, with Laurent and L. M. Disselkamp as witnesses. He asked Caldwell to examine the trust agreement and then it was signed by O'Brien and by Caldwell, on behalf of the Louisville Trust Company as trustee. Their signatures were witnessed by two persons. Caldwell took O'Brien to the vault department and introduced him to the superintendent. He obtained a safety box and deposited the two instruments there. None of the three living witnesses to these documents or the vault superintendent testified. Caldwell did not refer to John A. O'Brien's mental or physical condition. It does not appear that Laurent had ever been O'Brien's attorney. He had had a safety box jointly with his wife at another bank for several years. The trust agreement recited that O'Brien had caused six listed insurance policies to be deposited with the Trust Company. As a matter of fact they were never deposited. A significant thing is that the instrument listed a policy for $30,000 which had been cancelled and reissued as two policies, with different numbers, for $20,000 and $10,000, respectively. The record shows that John A. O'Brien's insurance premiums had been paid by the company and charged to his account, so it is a reasonable inference that the records of the firm still showed the original policy numbers and amounts. The policies themselves were at his home. Another thing of significance is the probability that John A. O'Brien would not leave any child surviving him, so that the trust and will both were for the benefit of his brothers, the widow receiving from his estate substantially only what she would be entitled to under the law upon a renunciation of any will.

Several weeks later John O'Brien set about diligently to undo what had been done and to revoke the trust. Without detailing the telephone conversations between Mr. Caldwell and Mrs. O'Brien, or certain letters of the two men, it seems sufficient to say that O'Brien revoked the trust and Caldwell returned to him the executed copy which the company had retained. O'Brien also notified at least some of the insurance companies that any trust he had undertaken to make had been revoked, and in December executed forms irrevocably designating his wife as sole beneficiary, with the exception of one policy. The one not so changed was for $50,000 and provided, in accordance with one of its options, for the payment of the proceeds to the widow in monthly installments and if any part remained in the hands of the company at her death the balance to the insured's children, but if none then to his mother, sister and brothers. In view of his actions with respect to the whole matter, we are persuaded this policy was overlooked.

John A. O'Brien executed a will bearing date of September 22, 1933 (although apparently acknowledged before the witnesses in October), as follows:

"I give to my wife, Patricia R. O'Brien, all of the household furniture and all of the personal property of my estate."

The tension between the parties was made more acute when Mrs. Patricia O'Brien ordered James O'Brien from her home in November and refused to let him see John, who was ill. A friend testified that John had said he did not want any of his brothers to come there.

This was the situation when John A. O'Brien died January 1, 1934.

When Mrs. O'Brien and her attorney presented the will of September 22nd for probate, they learned that Thomas A. Barker, who had been the attorney for E. J. O'Brien & Company for many years, had requested an officer of the court to notify him if any will should be presented since he had "a later will." It was disclosed at the probate proceeding that John O'Brien had a safety box with the Louisville Trust Company.

The opening of the box revealed the will of July 7, 1933, which was offered for probate by the Louisville

Trust Company, named as executor. It was probated with the will of September 22nd as a codicil. Mrs. O'Brien nominated the Fidelity & Columbia Trust Company as administrator with the will annexed, and the Louisville Trust Company asked that it be appointed. Both were named as co-administrators.

O'Brien's copy of the insurance trust was also in the box. Passing the disputed testimony as to the acts and statements of Barker at the time, it is pretty well established that Caldwell stated that the trust had been revoked, and that Barker questioned its revocation. Mr. Barker admits advising the Trust Company that he did not consider the trust legally revoked and he would insist on its being executed. Thereupon Mr. Caldwell notified the several insurance companies of the existence of the trust and that a claim to the proceeds of the policies would be made under it. However, one company paid Mrs. O'Brien $50,000 before it received this notice. This action had the effect of holding up payment of $150,000 proceeds of the other policies to Mrs. O'Brien as beneficiary. It was not until May, 1935, about 14 months later, that definite steps were taken toward suing to recover the insurance proceeds. Suggestions were then made (by whom in the first instance is not clear) that there could be no settlement of that issue without a settlement of the estate's interest in the partnership. Mrs. O'Brien was insisting that she did not want to dispose of that interest and that the insurance matter should be handled separately, while representatives of the O'Brien brothers were insisting upon joint consideration. Her attorneys seem to have been of the opinion that the propositions must be considered together. In the beginning, representatives of the brothers, and perhaps of the Louisville Trust Company, were suggesting, if not threatening, a contest of the will of September 22nd, and also contending that it should be construed as devising the widow only the household furniture and other personal effects of like character, with no interest in the partnership passing under it. All these claims were through or by Barker and by Joseph Laurent, who, it appears, was representing the O'Brien brothers as well as the Louisville Trust Company.

We think the foregoing a fair statement of the conditions. They reflect the attitude of the three brothers. However, each of them denied knowing anything about

the insurance trust or the will of July 7, 1933, until after John's death. Naturally her experiences and the attitude of the brothers placed Mrs. O'Brien on guard. And we have approached the consideration of the pivotal question in respect to the transaction involved in the litigation, namely, the accomplishment of the contract sought to be rescinded, believing that the partners started out to drive the best bargain possible to acquire their deceased brother's interest in the partnership, with little scruple as to the method or means to be employed. On the other side, we quite agree with the observation of the chancellor that "the role of the widow, forlorn and importunate, whose trusting innocence was betrayed by the Brothers O'Brien" does not fit Mrs. Patricia O'Brien. She seems to have early learned and understood her rights and quickly grasped a knowledge of financial values. She proved to be a resourceful and tenacious opponent, represented by able counselors, both in law and in finance, but whose advice she seems to have been reluctant to accept.

This specific designation of the litigants as the brothers collectively and the widow is because they were the active parties in the negotiations, personally or by agents. The administrators cum testamento annexo were, of course, the legal owners of the interest in the partnership and had the right therefore to speak and act for the estate. But they recognized Mrs. O'Brien as the actual owner, since she was the sole beneficiary of the estate and yielded first place to her. Early in the proceeding they advised Mrs. O'Brien that her attorneys were acceptable and that they would rely upon them for counsel and advice. However, throughout the negotiations the administrators, particularly the Fidelity & Columbia Trust Company, through J. G. McPherson, its Vice President and Trust Officer, frequently and fully advised and counseled with Mrs. O'Brien and her attorneys. In the end both administrators approved the contract. On the other side, the purchase of the interest, according to the record, was by James G. O'Brien individually, but his brothers through the attorneys for all three of them, conducted the negotiations and all joined in the contract of settlement.

The principle of law by which the respective responsibilities and rights of the parties is to be measured is pretty well agreed upon. But the attorneys differ in

its application. Likewise, with respect to the law applicable to certain specific rights of the deceased partner's estate in the assets of the partnership and to the ascertainment of their value. The fact that there was no dissolution of the partnership by reason of the death of John A. O'Brien and that his estate continued in the role of a partner distinguishes the case from most others of this kind. The interest involved resembles stock in a closed corporation; but the same duty, we think, devolved upon the partners seeking to acquire that interest as if the transaction was the acquisition of the interest of an inactive partner who was ignorant of the firm's affairs. That duty is expressed by the term uberrima fides, utmost good faith. This rests upon the legal principle that a surviving partner is in effect the trustee of the assets of the deceased partner and as such must faithfully and truly recognize and perform the obligation such a fiduciary owes a cestui que trust. And it is familiar law that a trustee may not handle the trust or act in any manner in relation thereto so as to profit personally or to reap an advantage at the expense of the trust. Specifically, in the exercise of that duty, the purchasers of the interest of John A. O'Brien in the partnership were obliged to deal fairly with Mrs. O'Brien and voluntarily disclose full and accurate information concerning the business, its affairs and values. Their duty was not passive. It was active. If she relied upon them having done so and they had not, she is entitled to a rescission or other equitable relief, if designedly, on the ground of fraud; if innocently, on the ground of mistake. Obviously if there was actual misrepresentation, the result is the same. Muir. v. Samuels, 110 Ky. 605, 62 S. W. 481; Erhmann v. Stitzel, 121 Ky. 751, 90 S. W. 275, 123 Am. St. Rep. 224; Rankin v. Kelly, 163 Ky. 463, 173 S. W. 1151; Chambers v. Johnston, 180 Ky. 73, 201 S. W. 488; Gilliam v. Spillman Motor Company, 220 Ky. 264, 294 S. W. 1090; Malden Trust Co. v. Brooks, 276 Mass. 464, 177 N. E. 629, 80 A. L. R. 1028; Grigg v. Hanna, 283 Mich. 443, 278 N. W. 125; Tennant v. Dunlop, 97 Va. 234, 33 S. E. 620. Although the motives of the brothers may have been bad and their intention evil, if in fact their agents made a full and true disclosure the case must be determined by what they did and not by what they intended to do. Nevertheless, as we have indicated, that attitude creates great suspicion and demands careful scrutiny of what was done.

Mrs. O'Brien had the correlative right to rely upon the revelations and representations as full and true. However, if she did not rely upon them but relied upon facts in possession of herself or counselors or methods of valuation as readily available to them as to the other side, and upon their conclusions, she cannot be heard to say that she was deceived. The fact that the widow had capable counselors did not relieve the surviving partners of any of their duties and responsibilities. But their retention, knowledge and counsel concerns very materially the factor of her dependence and reliance upon the prospective purchasers' representations, made or omitted. Tennant v. Dunlop, 97 Va. 234, 33 S. E. 620; Cotton v. Stevens, 79 N. H. 224, 107 A. 602; Cf. Combs v. Roberts, 237 Ky. 299, 35 S. W. (2d) 293.

Not only is there involved in the case the element of disclosure of the real facts and conditions but the factor of the manner of bargaining for the purchase of the interest in the partnership. The appellant contends that unfair threats and unconscionable pressure were brought to bear upon her, not only in relation to the affairs of the partnership business but in the matter of the insurance trust and her husband's will. The appellees maintain the fairness of the negotiations in both respects and undertake to justify all their contentions and conduct as being reasonable and legitimate. When, but not until, the remaining partners had performed their duty of disclosing the facts upon which the value of the interest rested, the latent or extrinsic elements and factors affecting those facts became proper subjects of discussion. But no pressure was proper in respect of the business or threats as to what the surviving partners would do in relation to it that might impair the estate's interest if the widow did not sell out to them was proper. This is the measure of the purchasers' duty in this respect. So much of this issue of duress as relates to the value of the estate's interest in the partnership is entwined with the question of disclosure and representations of value and must be considered in connection therewith. The matter of compromise and settlement of the brothers' claims as to the will and the insurance trust may be considered somewhat independently.

Mrs. O'Brien was represented by Edward P. Humphrey and Leo T. Wolford, whose legal ability and integrity are unquestionable. Also, as stated, she and

they counseled with J. G. McPherson, a banker and financier of recognized ability and trustworthiness, whose company had been nominated by Mrs. O'Brien to administer the estate. George D. Caldwell, Vice President of the Louisville Trust Company, co-administrator, was consulted from time to time by the attorneys and Mr. McPherson and both approved the transaction. The appellant was also advised by and counseled with friends and kinsmen of qualification. Thomas A. Barker and Joseph Laurent, until his death, then by his law partner, Squire R. Ogden, represented the O'Brien brothers. They did not personally participate in the negotiations as did Mrs. Patricia O'Brien.

The negotiations for a settlement began in June, 1935, eighteen months after John A. O'Brien's death. There was submitted to Mrs. O'Brien and her attorney a memorandum (referred to in the record as Exhibit 22) showing the ''Present interest'' of the estate to be $425,-649.45. At that time $54,000 had already been advanced to the administrators for the payment of inheritance taxes. Deduction of the value of the company's real property and the addition of the present worth of the widow's dower in it were made. The value of the subsidiaries was stated to be $252,500. This value was then depreciated 50 per cent. The estate's part of these two items was shown as 23.77 per cent, which was its percentage of the current capital account to the whole. There was added $17,500 as the widow's remainder interest in an insurance policy. The net was shown as $317,594.49. One-half of this was put down, $158,797.25, which may be said to be the sum first suggested or offered in settlement. The appellant has attached much significance to the representations of this memorandum, while the appellees insist it was only a starting basis, and, in any event, that it truly showed the value of John's interest with their claims of deductions as trading points appended. As a matter of fact $425,649.45 was the then correct value of the estate's interest in the firm as shown on its books, while $252,500 stated as the full value of the subsidiaries was $10,000 too much. Formal discussions were suspended during the summer and renewed in the fall. Mrs. O'Brien's attorneys had the audits of the company, which had been prepared by a reputable Chicago auditing firm, for the fiscal year ending November 30, 1934, and six prior years. On Mr. Humphrey's request Edwin J. O'Brien made an affidavit, that all the

assets of the partnership were described in the audit reports and that the partnership had no assets not reflected therein. He further stated· that the partnership did not have any money or bonds or other securities on deposit with the French government or anyone in its behalf, nor with anyone else to secure contracts. The audit showed the book value of the interest of John O'Brien's estate in the business on November 30, 1934, to be $479,648. But, as stated, when the negotiations began this had been reduced to $425,649.45 by the advancement of $54,000 for payment of inheritance taxes and by a credit of $1.45. This amount was used always as the basis for negotiations and consummation. It was contended in the beginning (a) that the widow was entitled only to the present worth of dower in her deceased husband's ·proportionate part of the real estate of the firm, which reduced her interest to $365,105. The case of Bennett v. Bennett, 137 Ky. 17, 121 S. W. 495, Ann. Cas. 1912A, 407, was relied upon as authority. While it appears the case was distinguishable, because here there had been no dissolution of the partnership, yet the point was a legitimate consideration and one not so fanciful that lawyers might not well differ about it. Coupled with this was the fact that her husband's last will or codicil gave her only his personal estate. If that were set aside or its construction limited as contended and the original will prevailed, she would receive only dower and one-half of the personalty. It was also contended (b) that the book value of the four wholly owned subsidiary companies should be cut in half, especially of an English company, because its present contract with the English government was only temporary and subject to being lost, as it appears it had been renewed as on probation. (c) Edwin J. O'Brien was one of a number of former directors of a closed bank against whom there had been rendered a joint and several judgment for about three million dollars. The effect upon the company's business should his interest in it be subjected to the collection of the judgment was also a proper subject for discussion. We doubt if any view was expressed, as Mrs. O'Brien testified, that her husband's share in the business would be subjected to the payment of this judgment. If it was, the opinion was one not worthy· to be given consideration by her lawyers, as it was not. These are the more important contentions which appear to have been made that the value of $425,649.45 shown on the

statement and books of the company as John's interest in the capital assets was not the true value and that his interest was in fact worth less than that sum. The differences in value as of the date of settlement a year later will be hereinafter considered. Other contentions of fraud and unfairness relate to a failure to make disclosure of values other than as shown on the books, or to the bargaining for purchase and sale.

Mrs. O'Brien contends, and is supported by one or two witnesses, that Barker threatened to incorporate the company and "freeze her out." He denies it. Evidently the subject of incorporation was discussed, perhaps not as a definite threat but as a possibility, for the articles of partnership provided that it could be done by the participating partners. Her attorneys naturally responded that the courts would protect her interest. Yet it was a condition to be considered.

We conclude that Mr. Barker in the beginning had said no audit for the estate would be permitted, yet recognized the force of Mr. Humphrey's statement that one could be procured through the courts. Mrs. O'Brien insists she continually pressed for an audit, but Mr. Humphrey's testimony is that while she talked about it she never requested that one be had, realizing the large expense involved. All parties concede the reputableness of the auditing firm employed by the company, whose reports were delivered to the representatives of the estate and Mrs. O'Brien. It has not been shown they were wrong and we do not conceive it to have been the duty of the surviving partners to have had another audit made.

The O'Briens' attorneys were still maintaining that the insurance trust had not been legally revoked because it stipulated that the right of revocation was reserved to John A. O'Brien personally and it appeared from Caldwell's report that it was his wife who had undertaken to speak for him, Caldwell denying that he received two different written communications signed by John A. O'Brien revoking it. This contention of a valid and subsisting trust was not substantial and Mrs. O'Brien's attorney so regarded it. It is doubtful if the instrument was ever effective. See Parks' Ex'r v. Parks, 288 Ky. 435, 156 S. W. (2d) 480. Nevertheless, the payment of $150,000 proceeds of the insurance had been held up for nearly two years because of that contention. The right

to contest the will of September 22, 1933, was a formidable claim. While Mrs. O'Brien, as we have stated, was insisting that she did not want to dispose of the estate's interest in the partnership, regarding it as a good investment, nevertheless her attorneys advised her that it would be better to do so than to remain associated with the brothers, whom she so bitterly disliked and who disliked her, and who could legitimately dissolve the partnership relation with the consequent depleting effect upon the value of her interest. It was wise counsel. These things were factors to be considered when a full revelation of the business and its worth had been made. Their settlement was part of the consideration for the sale of the partnership interest. The difference between its value and the cash payment for it is represented by their surrender.

Progressively increasing sums in settlement were suggested from time to time. McPherson felt an offer of $365,000 should be accepted, but Mrs. O'Brien was tenacious. Finally the O'Briens became willing to pay $380,000 in cash and to surrender to Mrs. O'Brien what is referred to as the remainder interest in the insurance policy, estimated to be worth $15,000 to $17,000. They agreed to release all claims under the insurance trust and not to contest the will or sue for a construction which would have rendered it practically nugatory. And finally Mrs. O'Brien agreed. She addressed a letter to her attorney in her own hand, saying that she had definitely decided to accept the proposition of $380,000 in cash and the personal securities of her husband, and authorized him to make a settlement on that basis, ''provided the O'Briens and the Louisville Trust Company release any and all claims to the insurance, amounting to $200,000.'' This letter is dated October 4, 1935. Bearing on the present claim that Mrs. O'Brien was deceived as to the value of her husband's interest and relied upon their representations is this significant paragraph:

''It is understood, of course, that this offer cannot be used in case of a suit and that by a suit I expect to raise the value of my husband's estate $200,000.''

We think it quite obvious this recognizes that the transaction involved the surrender of a considerable claim in compromise and settlement of the adverse claims of the other parties. It could not have referred to the insurance for its release was specifically mentioned in the

offer. The form of the letter appears to have been prepared by L. R. Curtis, an attorney and friend of John A. O'Brien and his wife, with whom they had consulted from time to time, the form perhaps being on Mr. Humphrey's suggestion. She undertook for a while to back down on this offer of acceptance. A formal offer of settlement was then prepared by Humphrey, addressed to the O'Brien brothers, their mother and sister, and signed by Mrs. Patricia R. O'Brien, and approved by the administrators. This is dated November 5, 1935. The proposition was accepted by James G. O'Brien, as purchaser, and consented and agreed to by the other members of the partnership and family of the deceased. The final documents and deeds were not executed until February, 1936. The balance of the money was then paid. Mrs. O'Brien was reluctant to execute the papers, and a suit for specific performance was threatened. Yet she did so and thereby confirmed the agreement made three months previously without raising any question of fraud and deceit.

It is disclosed that John A. O'Brien's share in the earnings of the company for the year ending November 30, 1935 (15 days after settlement was agreed upon), was $17,185.07, and his share in the increase in value of securities was $22,262.05. Crediting these sums to his account would have shown a book value of $465,096.57. This was subject to the opinions of depressed values of the entire business because of the extraneous factors described. For this Mrs. O'Brien received $380,000 in cash and the remainder or contingent interest in the insurance policy, worth at least $15,000, or a total of $395,000. This leaves out of consideration $54,000 early paid the administrators. She also received a clear title to the balance of $185,000 of life insurance, to all of her husband's other personal estate, including $60,000 in securities, and tangible property of an undisclosed value. And she secured her peace. A year later she renewed the conflict. It was not then possible to restore the status quo ante.

It is now contended in appellant's behalf that the true value of John A. O'Brien's interest in the partnership was $723,207.84 and that she was deceived by the failure of the surviving partners to disclose the valuations now to be considered.

■ Accountants calculated the good will of E. J.

O'Brien & Company to be worth $147,169.42. The formula of computation was to capitalize at 8 percent all earnings of the tobacco business for a period of years in excess of 6 per cent per annum. It does not appear that this element was considered by the parties during the negotiations unless it was contained in the suggestion or threat (according to the respective views) that Edwin J. O'Brien could or would withdraw and use his own name in a new organization. Where the business of a partnership firm is of such character and extent that it has a substantial good will (an intangible and evanescent item) it is generally regarded as an asset to be accounted for in the sale of an interest therein. Spalding v. Spalding's Adm'r, 248 Ky. 259, 58 S. W. (2d) 356; Waterbury v. Waterbury, 278 Ky. 254, 128 S. W. (2d) 568; In re Brown's Will, 242 N. Y. 1, 150 N. E. 581, and Annotations in 44 A. L. R. 510. But in this case it is doubtful if there was any good will of a character that should be regarded as a transferable asset by any individual member of the firm or his estate. The articles of partnership, by which O'Brien's estate was bound, provided that "the partners and the survivors of them will continue to remain under the firm name of E. J. O'Brien & Company for a term of Fifty (50) years from this date if they or any two of them shall so long live, subject, nevertheless, to determination as hereinafter provided." The firm name could not, therefore, be sold under any other condition. Other than the firm name it would appear that the good will was largely personal to Edwin J. O'Brien and James G. O'Brien. They alone in recent years had actively conducted the business and maintained the contact with customers.

The articles provided that the basis of sale of a deceased partner's interest at the expiration of five years should be "the value of the interest as shown by the books of the company or by appraisement, plus profits and interest if any." This definite contract between all the partners as to the alternative bases of purchase and sale cannot be ignored. It would seem to distinguish the case from the cases wherein the basis of negotiations was not defined. In such instances the true value of the firm's assets ordinarily is the basis rather than the book value. 47 C. J. 1167. The negotiations, as we have said, were predicated upon the book values, excepting the contentions of depressed values because of factors largely outside the business. And this, by the way, was a matter

of opinion based upon disclosed facts. The books carried no record of the intangible value of good will. But, above all, there is the outstanding fact that the existence of this element was just as well known to Mrs. O'Brien and her counsellors as it was to the remaining partners and their representatives, and could have been as easily calculated by them. We are of opinion that the failure to call attention to this item as perhaps one of value to be considered cannot be regarded as a fraudulent concealment. This conclusion is supported by the cases cited above relating to this item, and Rankin v. Newman, 114 Cal. 635, 46 P. 742, 34 L. R. A. 265; Douthart v. Logan, 190 Ill. 243, 60 N. E. 507; Marmaduke v. Brown, 254 Pa. 18, 98 A. 769; In re Moore's Estate, 228 Pa. 523, 77 A. 902.

■ It is contended that there was no disclosure of the fact that the appraised value of the firm's property was much greater than the book value. The claimed excess in John A. O'Brien's share is $37,254.93 for plants and equipment of E. J. O'Brien & Company, and $10,850.34 for tobacco stocks, a total of $48,105.27. The excess for the subsidiaries is $8,890.51 for plants and equipment and $6,688.18 for tobacco stocks, a total of $15,578.69. An appraisal of the plant and equipment had been made by a Chicago concern in 1931 and brought down to March, 1935, for the purpose of fixing insurable values.

The book containing this appraisal was delivered to Mr. Humphrey a day or so after the first meeting at which a settlement was discussed. It seems not to have been given much attention, but it appears never to have been returned with the audits to Mr. Barker, who had delivered them. The book, and what became of it, has been regarded in the argument as having an importance, it seems to us, disproportionate to to its materiality. First, because there is no reason to suppose that such appraisal was that contemplated by the Articles of Partnership. The provision for valuing the interest of a deceased partner five years after his demise was to be by the books "or by appraisement." We think this meant a special appraisement for that purpose. Secondly, all parties seem to have been content to settle upon the basis of the book value, subject to the reconciliation of opinions concerning the same and to the give-and-take bargaining in relation to the outside propositions, for we do

not find that the matter of valuation by appraisement was mentioned. We do not conceive it to have been the duty of the purchasers to have suggested it. Thirdly, every one of the auditor's reports for seven years, which were in the possession of Mrs. O'Brien's representatives and were considered by her attorneys, by Mr. McPherson, and by her independent advisers, including an expert accountant of Cincinnati for a brief while, contained a reference to those appraised values. The audits also showed the cost of the property less depreciation reserve and the percentages which had been used in computing depreciation. It seems the earlier audits were in possession of Mrs. O'Brien's counselors only a short while. But they continued to have the audit for November 30, 1934, which is that most important throughout. It contained this reference:

> "The property, plant and equipment was appraised by Coats and Burchard Company on March 31, 1934, and the net sound value as determined thereby was $506,301.95. The appraised valuation of the property has not been set up on the books."

After the institution of this suit to rescind the contract, the plaintiff procured an appraisal company from Milwaukee to appraise all the properties retroactively. This appraisal of the plant and equipment is not substantially different from the appraisal the company had had made at the time by a different appraiser. The appraisal of the tobacco seems to have been by an analysis of the certain records and the consideration of actual profits which had been made on the tobacco found to be on hand at the close of the year 1935. There had been no appraisal by the company of its tobacco stocks other than the annual inventories, which purported to show the true value. These had been made in the same manner for twenty years. The cost of the tobacco was regarded and a fair estimate made of what it could surely be sold for without incurring a loss, possible profits being disregarded. This consistent and regular method of taking and recording the inventory in the usual course of business, with its acceptance throughout the years by John A. O'Brien and other partners, and by all taxing authorities, was as fair and equitable a basis as the purchasers were called upon to disclose. There was certainly no bad faith in this respect. A retroactive valuation, based upon percentages of profit and in the light of

subsequent events which proved profitable, cannot be regarded as the standard.

We are of opinion, therefore, that the claim of concealment of the appraised values, regarded by appellant as the true value, of the firm's assets was properly disallowed.

■ A partial audit of the accounts of the company was made for the plaintiff by a Detroit firm pending the trial of the case. Its examination of the company's income tax reports for the years 1931 to 1935, inclusive, revealed that the United States government had refused to allow as much depreciation as the company had claimed and set up, and rejected certain deductions for obsolescence and bad debts. The amount of John A. O'Brien's proportion of this disallowance was $5,083.69. This was not disclosed to Mrs. O'Brien or her advisors. They did not have possession of the income tax reports and knew nothing about this matter. It is not clear whether adjustments were made on the books of the company so that these disallowances were reflected in the book value of the firm's assets. But in any event, this was a matter of opinion of accountants and somewhat like the tobacco inventories—it was regarded as proper and legitimate accounting in the regular course of business and accepted by all partners.

Other contentions of unfairness and fraud relate to the bargaining for the purchase and sale of the partnership interest or to a failure to disclose values other than as shown on the books of the company.

■ The appellant submits that there was a breach of duty in failing to disclose the profits of the company for the year ending November 30, 1935, $80,870.93, of which the share of her husband's estate was $17,185.07. The larger part of this was income from the securities. As has been stated, the negotiations for five months had been based upon the valuation of John A. O'Brien's interest in the company as $425,649.45, as stated in the memorandum, Exhibit 22, which was that shown by the books of the company as of November 30, 1934, disregarding the $54,000 advanced since O'Brien's death. The evidence is conflicting as to whether Mrs. O'Brien was told there were no profits for that year. It appears that the profits could not be definitely ascertained until the end of the fiscal year, November 30th, after inven-

tories had been taken. The offer of compromise, dated November 5th, signed by Mrs. O'Brien personally and approved by her husband's administrators, contains this paragraph:

"(5) The above named parties to whom this offer is made or such one or more of them as desires or desire to accept it, can purchase the partnership interest belonging to the estate of John A. O'Brien, *including all accrued and unpaid dividends and net earnings or income thereon* for the sum of Three Hundred and Eighty Thousand Dollars, *this offer to remain open until and including the 15the day of November, 1935,* said payment of Three Hundred and Eighty Thousand Dollars to be made as follows: One Hundred Thousand Dollars within fifteen days after the acceptance of this offer and the balance within sixty days after the expiration of said fifteen days."

We have italicized the portion of the offer and contract which conclusively shows that Mrs. O'Brien took into consideration the matter of additional profits and demanded acceptance and a practical consummation before the end of the fiscal year. Ordinarily a failure to disclose accrued profits in such a case as this may be said to be a violation of the obligation of uberrima fides. Cf. Chambers v. Johnson, 180 Ky. 73, 201 S. W. 488. But in the circumstances of this case, especially the recognition in the offer to sell the partnership interest that there were or may have been profits and that they were being taken into consideration, we think the appellant waived what might otherwise have been a violation of duty to her.

■ Of like character, or perhaps of less merit, is the claim rested upon a failure to disclose the increase during the year in the value of stocks and bonds owned by the firm. John A. O'Brien's share, as subsequently calculated, was $22,262.06. The widow and her counselors had a complete list of those investments as of November 30, 1934. The list had remained quite constant in later years and there had been no substantial change during 1935. All of the securities were listed on the stock exchanges and their value daily reported in the newspapers. We do not think there was any duty to direct attention to the changes in the market. There could have been no concealment of something so public; indeed, there is un-

contradicted evidence that Mrs. O'Brien personally, and her advisors also, had looked into the matter of these values. The offer of settlement contained reference to similar personal investments of John A. O'Brien, "the market value of which at this time is estimated at upward of $60,000." All of these securities were to be received by the widow. It would seem, moreover, that the reference in the offer to "all accrued and unpaid dividends and net earnings or income thereon" embraced the increase in the value of the securities, although it cannot be said to do so definitely.

■ The company had three subsidiaries, each of which was a corporation, whose entire capital stock was owned by the partnership. We may disregard the fact that these were independent entities, with the cost of the company properly representing its investment, and regard each of them as but the alter ego of E. J. O'Brien & Company. These stocks were carried on its books and report in the audit of November 30, 1934, at a cost of $242,500. The audit of November 30, 1935, showed the cost and value to be $307,500. It appears that a fourth subsidiary corporation had been created during the year and the partnership furnished its capital. The capital stock of the Tobacco Rehandling Company, another of the subsidiaries, was also increased during the year. Neither transaction changed the net worth of the parent company, for they were in fact but bookkeeping entries. The contentions of failure to reveal the appraised valuation of the subsidiaries' property and their income for the year 1935 is in the same category as the contentions relating to the parent company's property and income.

The books of the subsidiaries at the end of the fiscal year, October 30, 1935, showed a combined net worth greater by $26,811.71 than that shown on the books of the parent company, but $26,104 of this increase was 1935 profits. It appears that every year the profits of these subsidiaries were transferred to O'Brien & Company. What has been said with reference to the inclusion of profits of the parent company applies to this item.

■ As stated, the accounts of the several partners, the aggregate of which represented the company's capital, varied from time to time in amounts and in their respective proportions to the whole. As far back as 1930 the account of Edwin J. O'Brien was much less

than that of the others. At the same time the account of the mother, Mrs. Elizabeth G. O'Brien, was nearly twice as much as any of the others, although her basic interest was only 15% compared to their 21¼%. At the close of the fiscal year 1932, Edwin J. O'Brien's account was overdrawn $191,358.17, and at the close of 1934, which formed the basis of settlement with the appellant, his account was overdrawn $153,500. It was still overdrawn at the end of 1935 in the sum of $144,994. James G. O'Brien's account was always larger than that of his brothers. That year he had $698,698 to his credit. John A. O'Brien, as already stated, had $479,648 to his credit. These conditions were shown on the several audits. It does not appear that during the negotiations anything was said about Edwin J. O'Brien's overdraft, but the possibility of his bankruptcy and its effect on the affairs of the company was suggested as an impairment of the value of the whole. Appellant has claimed that this overdraft was concealed from her and that in a retroactive accounting Edwin J. O'Brien should be charged with interest on his deficiency. He had continued to share in the profits in the same proportion and to receive a salary of $25,000 a year. During certain periods of each year the company borrowed large sums and it is submitted that the expense of borrowing would have been much less had the capital not been thus depleted. The amount of the estate's share in such a charge of interest, calculated as 21¼%, is claimed to be $36,477.70.

The articles of partnership did not provide for any adjustment of differences in the partners' respective interests in the capital. Nor had any ever been made as a matter of financial operation. At most, if appellant's argument of an accounting is sound and equitable, there would have to be a striking of averages, in which event James O'Brien and Mrs. Elizabeth O'Brien would be entitled to credit for their constant, large excess over the average. The general rules pertaining to the allowance of interest for use of money, referred to in Carrs Fork Coal Company v. Johnson Drug Company, 249 Ky. 371, 60 S. W. (2d) 952, 953, do not apply in partnership settlements; nor does the rule which is followed where there was a dissolution of the partnership because of the death of one of the partners and the survivors had carried on the business and retained and used the share of the deceased partner, as in Collins v. Hudson's Adm'x, 282 Ky. 810, 140 S. W. (2d) 365. Ordinarily, in the ab-

sence of a special agreement, in the settlement of partnership accounts, interest is not chargeable or allowed until after a balance has been struck. However, in an exceptional case the adjustment and the equities may demand that such a charge be made, the question being determinable upon the circumstances of each particular case. Spalding v. Spalding's Adm'r, 248 Ky. 259, 58 S. W. (2d) 356; Waterbury v. Waterbury, 281 Ky. 107, 134 S. W. (2d) 1009; Annotations, 66 A. L. R. 22. The appellant cites several foreign cases and Masonic Savings Bank v. Bangs' Adm'r, 10 S. W. 633, 10 Ky. Law Rep. 743, as sustaining the point that equity demands that the interest of John A. O'Brien be increased by this charge of interest. In the Bangs Case a deceased partner had appropriated a firm's money, used its name in obtaining money from others for his individual purposes and had withdrawn much more than he was entitled to withdraw from its assets, to the detriment of the partners. A compromise agreement had been made with creditors of the deceased partner with respect to the disputed claims of the surviving partners against his estate, which included interest on the indebtedness of the company. It was held under the circumstances that interest should also be allowed on additional claims representing money which the surviving partners had had to pay on account of his misappropriation. The case was stated to be an exceptional one and the allowance was rested upon the fraudulent retention and improper application of the firm's money. The instant case is not like that. E. J. O'Brien's overdraft was shown on the books of the company, and under the practice and the regard always had for these accounts it must be said that it was consented to by the other partners. Moreover, this is not a settlement of a partnership upon dissolution. It is a question of valuing an interest in a continuing concern and the challenge of the fairness of the firm's manner of bookkeeping. In our opinion the equities do not require that a retroactive accounting should be made against Edwin J. O'Brien any more than that a retroactive credit should be allowed to those members of the firm whose proportionate shares in the capital account were more than the average. To require this would be to make a contract for the parties which they themselves never made. After all, the point is whether there was a concealment of this matter. While the audits in possession of the appellant and her counselors did not reveal that no interest had been charged

Edwin J. O'Brien or credited to the other partners or their accounts, the condition of the accounts was shown in the audits. It cannot be said there was a fraudulent concealment and we think the chancellor properly held that this adjustment should not be made.

In conclusion, it has not been overlooked that the burden rested upon the plaintiff to show a failure to reveal material facts in the settlement, which is essentially to prove fraud and deceit. But the degree of proof in cases of this kind varies inversely with the knowledge of the matters involved and the trust reposed in the other by the party challenging the settlement. Thus where both parties are acquainted with the partnership affairs and neither reposed special confidence in the other, the burden of proof is greater than where one did not have full knowledge of the business and relied upon his partner. In such a case the settlement is deemed less conclusive. Chambers v. Johnston, 180 Ky. 73, 201, S. W. 488; 40 Am. Jur., Partnership, sec. 131. We have the peculiar situation here of innocence by the challenger of the conditions of the business who, however, had no confidence in the representations of those with whom she was dealing and who had competent and trustworthy counselors. Taking into consideration all these factors as well as the formidable ones mentioned in the beginning concerning the attitude of those with whom the plaintiff had dealt, we are of opinion there was a fair and reasonable settlement and contract of purchase and sale.

On a second petition for rehearing the appellant argues for the first time that she was deprived of due process and equal protection under the law, vouchsafed to all citizens by the Fourteenth Amendment to the Federal Constitution. The same rights are protected by the Bill of Rights of the Constitution of Kentucky. Sections 3 and 14. The claim is rested upon: (1) The ruling of the trial court rejecting as incompetent certain evidence offered by the plaintiff and admitting certain evidence against her as competent; (2) denying her motion for a subpoena duces tecum for certain records of the defendants; and (3) the chancellor's "frequent contemptuous observations as to the plaintiff and her evidence."

If the rulings of the court should be regarded as erroneous, such action does not in our opinion offend constitutional rights. Due process of law does not assure a litigant against a wrong interpretation of the law,

especially procedural, or against a judicial error in respect to the admission or exclusion of evidence. Arrowsmith v. Harmoning, 118 U. S. 194, 6 S. Ct. 1023, 30 L. Ed. 243; Ex parte Converse, 137 U. S. 624, 11 S. Ct. 191, 34 L. Ed. 796; Jones v. Buffalo Creek Coal & Coke Co., 245 U. S. 328, 38 S. Ct. 121, 62 L. Ed. 325; In re Pusey's Estate, 321 Pa. 248, 184 A. 844, certiorari denied Lavely v. Y. M. C. A., 299 U. S. 572, 57 S. Ct. 36, 81 L. Ed. 422; Stephenson v. Kirtley, 269 U. S. 163, 46 S. Ct. 50, 70 L. Ed. 213.

This was a long trial, vigorously fought and presenting many complex questions of law and fact. From time to time during her examination the court tried to restrain the garrulity of the plaintiff when testifying. Sometimes the Judge showed impatience. Perfect patience is a virtue seldom possessed, even by a judge. The manifestation of this inherent human quality, however, does not violate any constitutional right of a litigant; especially if there is no jury whose views might be affected by it. The fact that a court severely criticizes the testimony of a witness whom he disbelieved will not support charges that he prejudged the case or showed bias, prejudice or capricious disbelief of evidence in his disposition of the case, nor nullify or otherwise affect his findings on evidence which he believed credible. In re Pusey's Estate, supra. Moreover, this court has tried the case de novo and it is not claimed that we have denied the appellant a complete hearing or a fair trial.

We are of opinion that the judgment should be affirmed, and it is so ordered.

Whole Court sitting.